**Slip Op. 05-87**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: SENIOR JUDGE NICHOLAS TSOUCALAS

_____
                                          :
UNITED STATES,                            :
                                          :
     Plaintiff,                           :
                                          :
     v.                                   :    Court No. 02-00116
                                          :
FORD MOTOR COMPANY,                       :
                                          :
     Defendant.                           :
                                          :
_____ :

     Plaintiff, the Bureau of Customs and Border Protection of the
Department of Homeland Security ("Customs"), seeks collection of a
civil penalty pursuant to 19 U.S.C. § 1592 (1988), and customs
duties concerning entries of vehicles and vehicle components made
between 1987 and 1992 by defendant, Ford Motor Company ("Ford").
Customs alleges that Ford violated 19 U.S.C. § 1592 by acting
grossly negligent or negligent in making false statements or
omissions in connection with the entry of the merchandise at issue.
Accordingly, Customs seeks civil penalties in the amount of
$34,576,559 if Ford's conduct was grossly negligent or $17,288,279
if such conduct was negligent. Customs also requests the Court to
award it $68,178 for unpaid duties. Ford counterclaims for a
refund of all or part of the $8,575,961.80 it has tendered for
duties in connection with this matter plus interest, as provided
for by law.

     **Held:** Pursuant to the findings of fact and conclusions of
law, judgment is entered in favor of Customs. Ford acted
negligently in its entry of the merchandise subject to this action.
Accordingly, Ford is assessed a civil penalty of two times the loss
of revenue, $17,151,923.60, plus lawful interest. Customs' request
for $68,178 for unpaid duties is denied. Defendant's counterclaim
for a credit for duty tenders made in connection with this matter
is dismissed.

[Judgment is entered in favor of Customs for $17,151,923.60, plus
lawful interest.]

     Peter D. Keisler, Assistant Attorney General, David M. Cohen,
Director, Patricia M. McCarthy, Assistant Director, Commercial
Litigation Branch, Civil Division, United States Department of
Justice (David A. Levitt and David S. Silverbrand); of counsel:

Jeffrey E. Reim and Katherine F. Kramarich, Bureau of Customs and Border Protection, for the United States, plaintiff.

   Grunfeld, Desiderio, Lebowitz, Silverman, & Klestadt, LLP (Steven P. Florsheim, Robert B. Silverman, David M. Murphy, and Robert F. Seely); of counsel: Paulsen K. Vandevert, for Ford Motor Company, defendant.

Dated: July 21, 2005

**OPINION**

**TSOUCALAS, Senior Judge:** Plaintiff, the Bureau of Customs and Border Protection of the Department of Homeland Security ("Customs"), seeks collection of a civil penalty pursuant to 19 U.S.C. § 1592 (1988), and customs duties concerning entries of vehicles and vehicle components made between 1987 and 1992 by defendant, Ford Motor Company ("Ford"). Customs alleges that Ford violated 19 U.S.C. § 1592 by acting grossly negligent or negligent in making false statements or omissions in connection with the entry of the merchandise at issue. Accordingly, Customs seeks civil penalties in the amount of $34,576,559 if Ford's conduct was grossly negligent or $17,288,279 if such conduct was negligent. Customs also requests the Court to award it $68,178 for unpaid duties. Ford counterclaims for a refund of all or part of the $8,575,961.80 it has tendered for duties in connection with this matter plus interest, as provided for by law.

## DISCUSSION

Customs filed a timely complaint on January 29, 2002, alleging that Ford made material false statements or acts or material omissions in connection with the entries of vehicles and vehicle components entered into the United States between January 1, 1987, continuing through December 1992. See Compl. ¶¶ 4-6. In its complaint, Customs alleges that Ford acted grossly negligent or negligent by: (1) falsely understating to Customs in its entry documents the price it paid or agreed to pay for the subject merchandise; (2) falsely declaring as true and correct the prices and other statements in the entry documents for the subject merchandise; (3) failing to declare on the entry documents that the prices set forth therein were not the final prices and were subject to adjustments based upon agreements Ford had with its suppliers; (4) failing to report upon entry the value of assists provided by Ford for the production of the imported merchandise; and (5) failing to produce to Customs "at once" information received after importation indicating that prices on its entry documents had been adjusted to include lump sum payments made by Ford to its suppliers pursuant to purchase contracts. See id. ¶ 6. Customs claims that Ford's false statements or material omissions deprived the United States of $8,644,139.80 for lawful duty of which $68,178 remains unpaid. See id. at ¶ 9. A bench trial was held on March 15, 2005, through March 23, 2005, to resolve the issues of fact remaining in

this action.  Pursuant to USCIT R. 52(a), "[i]n all actions tried upon the facts without a jury . . . the court shall find the facts specially and state separately its conclusions of law thereon . . . ."  USCIT R. 52(a).  Accordingly, the Court's findings of fact and conclusions of law are set forth below.

## I.    Findings of Fact

At trial, Customs produced two witnesses, Mr. Michael Turner, former Special Agent in the Detroit Customs Office of Enforcement, and Mr. Robert Neckel, former group supervisor of the Detroit Customs Office of Enforcement.  Both witnesses testified to various factual matters relevant to Customs' investigation of Ford such as, the scope of the investigation, the date such investigation commenced, and the findings Customs made pursuant to its investigation.  Ford produced two witnesses, Mr. Harry Gibson, former attorney in Ford's Office of General Counsel, and Mr. Donald Cohen, former manager of Ford's International Transportation and Customs Office.  Both witnesses testified, inter alia, to their knowledge of Customs' investigation and the scope of the investigation as it related to Ford.  Messieurs Gibson and Cohen also testified about Ford's customs compliance procedures, compliance record, and Ford's responses to inquiries made by Customs regarding its investigation.

Customs and Ford identified documents relating to the investigation and Ford's compliance measures. Such documents were moved by the parties and admitted by the Court into evidence. The Court finds most of these documents highly probative because they provide contemporaneous accounts of events related to Customs' investigation, Ford's response to the investigation, and Ford's customs compliance procedures. The Court finds that the testimony of Messieurs Gibson and Cohen was not highly probative because the demeanor of the witnesses and the testimony they supplied proves that they did not independently recall events or facts relevant to Customs' investigation of Ford. The Court, however, finds the testimony of Messieurs Turner and Neckel highly probative and credible based on their demeanor and ability to independently recollect Customs' investigation of Ford.

The Court also heard testimony from: (1) Ms. Laura Cox (formerly Ms. Laura Erpelding), former Special Agent in the Detroit Customs Office of Enforcement; (2) Ms. Dathrenal Davis, former Import Specialist and Field National Import Specialist for the commodity automotive team in Detroit Customs; (3) Mr. Richard Bridenbaugh, former member of Ford's customs unit; (4) Ms. Karen Monro, former member of Ford's customs unit; and (5) Mr. Walter Manns, former Supervisory Import Specialist and former member of Ford's customs unit. Based on the demeanor and quality of

testimony of these witnesses, the Court finds them slightly probative because they did not exhibit an independent recollection or have knowledge of events or facts relating to the subject of this action. Ford and Customs stipulated to the admission of deposition testimony of Mr. Phillip Kruzich, former analyst in Ford's customs unit, and the deposition and prior trial testimony given in Court No. 02-00106 of Ms. Angela Ryan, former Supervisory Import Specialist of the automotive team in Detroit Customs.

The testimony presented at trial along with the documents admitted into evidence established by a preponderance of the evidence the following facts.

### A.    Findings of Fact Relevant to the Commencement and Scope of Customs' Investigation

1.    Ford entered the vehicles, vehicle components, tooling and related materials for the five import programs identified in Exhibit A to the complaint between January 1, 1987, through December 31, 1992. See Pretrial Order, Schedule C ¶ 3.

2.    Operation Hat Trick was a trade enforcement initiative meant to "subject certain Big Three import programs to joint Office of Enforcement, Commercial Operations, and Regulatory Audit scrutiny to identify undeclared assists and indirect payments, determine the level of culpability of parties responsible for the failure to declare the assists/payments, and, refer cases

for criminal and civil action as appropriate." Pl.'s Ex. 70; see also Trial Transcript ("TT") at 37-39. Operation Hat Trick was initiated by Mr. Turner, based on his personal observations and information obtained from import specialists indicating that Ford and other car manufacturers were not declaring the full value, or price paid or to be paid, for merchandise entered into the United States. See TT at 37-38 & 283.

3. Plaintiff moved into evidence several reports of investigation ("ROI") prepared by Mr. Turner or Ms. Cox in the ordinary course of their business as special agents of Customs' Office of Enforcement. See Pl.'s Ex. 1, 52, 59, 70, 71. The Court places substantial weight on the veracity of the ROIs that were contemporaneously written with events concerning the commencement of Customs' investigation of Ford. See Pl.'s Ex. 70 & 71. The Court gives less weight to the ROIs which summarized the findings of Customs' investigation, particularly ROI #15 and ROI #22, because these ROIs were prepared in anticipation of penalty proceedings. See e.g., Pl.'s Ex. 1, 52 & 59. In preparing certain ROIs, the special agents often used notes and previous ROIs to compile their findings. See TT at 170-172; see e.g., Pl.'s Ex. 52 at 5 (referencing ROIs #3 & 5). While events are recorded in ROIs #15, 22, and 27, see Pl.'s Ex. 1, 52, 59, these ROIs also

contain the legal conclusions of Customs. See TT at 185 & 226. For example, ROI #22, dated November 23, 1994, is a penalty referral reporting the findings of Customs' Office of Enforcement as well as making legal conclusions relating to Ford's culpability under 19 U.S.C. § 1592. See Pl.'s Ex. 1. Consequently, the Court gives ROIs #15, 22, and 27 less weight than the earlier reports, ROI #1 and 2, because the former did not simply record contemporaneous events or facts.

4.  Operation Hat Trick "included all the components surrounding value, material omissions, undervaluations, payments that may not have been reflected on the invoice that was submitted with the entry summary . . . ." TT at 283; see also TT 37-38.

5.  During Operation Hat Trick, Customs looked at Ford's prior importations and found repeated instances where Ford had "failed to declare and pay duties on assists and indirect payments at the time of entry summary, but only declared those assists/payments in response to import specialist Requests for Information ('CF-28s')."[1] Pl.'s Ex. 71 at 1; See also TT at 283.

---

[1] A CF 28 was a request for information made by Customs to importers when it had questions regarding an entry. See TT at 304-05.

6.  The Ford vehicle and vehicle component programs investigated by Customs included the Lincoln Mercury Capri ("Capri"),[2] Ford Festiva ("Festiva"), Mercury Tracer and Taurus SHO engine ("Yamaha SHO engine"). See Pl.'s Ex. 70.

7.  On May 23, 1991, Customs notified Ford by letter that it had opened a formal investigation of Ford "concerning the proper declaration of assists and indirect payments in imports of vehicles and vehicle component assemblies." Pl.'s Ex. 5; see also TT at 39-42; Pl.'s Ex. 71; Pretrial Order, Schedule C ¶ 14.

8.  Ford requested a meeting with Customs to discuss the May 23, 1991, letter because neither Mr. Gibson nor Mr. Cohen knew what Customs meant by an indirect payment. See TT at 496-97; see also TT at 45-46. Ford did not "make indirect payments in terms of the general definition that we knew; that is, a payment to A, A makes a payment to B for the benefit of C. That is what we thought was an indirect payment, and Ford did not do that." TT at 498; see also TT at 508.

9.  The meeting was held on June 7, 1991, and was attended by Messieurs Turner and Neckel from Customs and Messieurs Gibson, Cohen, and Ron Hamell from Ford (the "June 1991 Meeting"). See TT at 45-50; Pl.'s Ex. 71.

---

[2] The Capri was also referred to as the "SA30" vehicle. See Pl.'s Ex. 52 at 5.

10.  The scope of the investigation, the meaning of the term "indirect payment," and prior disclosure were issues discussed at the June 1991 Meeting.  See TT at 45-50, 480-81, 489, 498-99; Pl.'s Ex. 71.  Customs explained to Ford that "the investigation was going to look at the full scope of their imports of automobiles and automobile parts; that [Customs] would be looking programatically one program at a time."  TT at 47; see also TT at 51-52; Pl.'s Ex. 71.

11.  Messieurs Cohen and Gibson testified that they asked for a definition of "indirect payment" from Customs at the June 1991 Meeting, but Ford never received a definition from Customs.  See TT at 481 & 498.  Mr. Gibson testified that, "We asked what was an indirect payment.  Agent Turner says 'Here.' He presents two summonses . . .  I signed for the two summonses, and we said we would get back to them with our responses, and we left."  TT at 498; see also TT 510 (stating that Ford left the meeting not understanding the meaning of indirect payments).  The Court finds it incredible that Ford requested the meeting to discuss the definition of the term "indirect payment" only to leave the meeting without having received a satisfactory response from Customs.

12.  During the June 1991 Meeting, Customs served Ford with a summons relating to the Capri program.  See Pl.'s Ex. 7 & 71; TT at 53-56.

13. The summons requested "all original records and documents related to any and all assists and payment made by Ford Motor Company in connection with the design, development, engineering, production, purchase, and importation of Mercury Capri automobiles into the United States . . . ." Pl.'s Ex. 7. The scope of the investigation with regard to Capri "involved . . . all records relating to the importation of Capri and Capri parts." TT at 482; see also TT at 285.

14. Ford was advised at the June 1991 Meeting that Customs' investigation included the entire scope of Ford's importations of certain vehicles and vehicle components. See TT at 286-88; Pl.'s Ex. 71.

15. Ford knew or should have known that the term "indirect payment," as used by Customs in its notification to Ford of the investigation, included all payments that impacted the final price paid by Ford for the merchandise in question. See TT at 511-12. The term "indirect payments" included lump sum payments for engineering and manufacturing expenses, retroactive price adjustments, and volume price adjustments. See TT at 47-48, 284, 287-88, 482; Pl.'s Ex. 71.

16.  An assist is an item provided by the buyer, such as Ford, to the seller either free or at a reduced cost for the design, development or production of merchandise imported into the United States. See Joint Ex. 2 at G at 17; see also TT at 284 & 493.

17.  "The investigation included all payment, indirect or otherwise, so [Customs] wanted to be sure that we were thorough and we got the information relative to all payment." TT at 286.  "At the conclusion of the meeting Ford indicated that they better understood what [Customs was] looking at; the fact that it was automobiles and automobile parts; that it was both the actual providing of assists as well as payments that impacted the agreed upon price."  TT at 48.

18.  Ford was advised by Customs that the investigation would encompass entries made between 1987 through the 1991 model year.  See TT at 188-90.  Importations related to the 1992 model year and thereafter were not within the scope of Customs' investigation. See TT at 188-90.

**B.   Findings of Fact Relevant to Ford's Reconciliation Agreement with Customs**

19.  Ford's supply agreements with many of its foreign vendors contained post-importation price adjustments, which typically provided a per vehicle or vehicle component base price subject to possible modifications.  See Pretrial Order, Schedule C ¶

1. Although the prices Ford paid for vehicles and vehicle components was "fairly firm," the prices could increase based on the supply agreements Ford had with its vendors. <u>See</u> TT at 492.

20. The supply agreements requiring lump sum payments, retroactive price adjustments and other post-entry payments were negotiated and signed prior to the shipment of the merchandise. <u>See</u> TT at 512.

21. In a letter dated October 14, 1988, Ford proposed to Customs a change in how it reported lump sum payments. <u>See</u> Pl.'s Ex. 55. In its letter, Ford stated that a lump sum annual reconciliation report would allow Ford to track all lump sum billings throughout the entire model year and reduce the paperwork and time associated with the reconciliation process for both Ford and Customs. <u>See</u> <u>id.</u> Ford proposed the following policy:

> 1. The Ford Motor Company will track all lump sum billings throughout each model year (July 1 to June 30) and report the dutiable expenses associated with each import program. Credits will be used to offset relevant debits with final dutiable expenses being reported. If the final dutiable expense results in a credit balance to the Ford Motor Company, a negative report will be presented to U.S. Customs. Dutiable expenses for future model year import programs will be recorded in their respective model year and reported at the close of the model year.
>
> . . .
>
> 3. An annual reconciliation report will be prepared for

each import program and filed with the Detroit customs district <u>within 60 days</u> after the close of each model year (July 30) to enable us to followup and capture all relevant model year expenses. All backup data will be retained in our office and will be available for your review up request.

Pl.'s Ex. 55 (emphasis in original).

22. In a letter dated August 29, 1989, Customs accepted Ford's proposal to report and reconcile lump sum payments on an annual basis ("Reconciliation Agreement"). <u>See</u> Pretrial Order, Schedule C ¶ 8. Customs, however, made two modifications to Ford's proposal: (1) Ford would not be allowed to offset debits with credits; and (2) Ford would only be allowed to annually reconcile withheld duties on entry summaries which had already been liquidated. <u>See</u> Pl.'s Ex. 55. Customs response did not indicate a modification to the time period proposed by Ford. <u>See</u> Pl.'s Ex. 55; TT at 550.

23. A model year ran from July 1 to June 30. <u>See</u> Pretrial Order, Schedule C ¶ 2.

24. Under the Reconciliation Agreement, Ford was obligated to file its annual reconciliation report with Detroit Customs within 60 days of the end of the model year, <u>i.e.</u> August 31. <u>See</u> Pl.'s Ex. 55; <u>see also</u> Pl.'s Ex. 17 at 2 (Ford states that certain costs incurred for Yamaha SHO engines "will be declared 60 days after the end of the 1992 model scheduled to end July 30, 1992"); TT at 307-09 & 476-77. Mr. Kruzich

testified that he came up with the 60 day time period because he "thought it was reasonable at the time."  Joint Ex. 2 at 114.

25.  With the exception of one reconciliation report, <u>see</u> Pl.'s Ex. 8, Ford failed to file reconciliation reports within 60 days of the end of the model year.  <u>See e.g.</u>, Pl.'s Ex. 14, 15, 17, 19, 20; Def.'s Ex. LL, MM, NN.

26.  Ford was not notified of the untimely nature of its submissions.  <u>See</u> TT at 322-23, 355-56, 394.  Ford did not ask Customs for permission to extend the 60 day period.  <u>See</u> TT. at 364; Joint Ex. 2 at 117.

27.  Ms. Monro, the Ford employee responsible for the reconciliation program from approximately 1990 through 1993, <u>see</u> TT at 381, was not aware of the deadline for the submission of reconciliation reports to Customs.  <u>See</u> TT at 392.

28.  The lump sum payments Ford made to its suppliers were made subsequent to entry and, therefore, the amount of the payments was not known at the time of entry.  <u>See</u> TT at 382.  The invoices or entry documents reviewed to make reconciliation reports did not indicate that the prices were subject to change.  <u>See</u> TT at 410 & 492.

29.  "[A]ny expenses that came in for a model year for a particular program after that model year closed went into the program

folder for the next model year when [Ford] would declare it." TT at 386; see also TT at 402-03 & 435-36. "If the entry had been liquidated, then [Ford] would tack . . . the additional duties onto an entry that was not liquidated even though the entry may not have related to the program that initially incurred it." TT at 488; see also Joint Ex. 2 at 179.

30. Ford began the reconciliation process at the end of the model year, see TT at 387-88, even though the reconciliation process "could take anywhere from a few months to six months to eight months." TT at 391.

31. Between 1987 and 1992, Customs did not have a regulation requiring an importer to put a statement on the entry documents indicating that the price may change after entry. See TT at 531; Joint Ex. 1 at 511.

32. Ford did not entirely capture additional assists or lump sum payments in its initial reconciliation reports for each program. See TT at 471 & 474-75; Joint Ex. 2 at Z.

### C. Findings of Fact Relevant to Ford's Unreported Tooling Assists and Payments for 1987-1992

33. Ford had a program to report assists, whereby it gathered information about assists at the time of importation and paid all duties related to such assists on the first entry. See TT at 493-94.

34. Assists related to vehicles and vehicle components "start to

occur in Ford's major programs sometimes two, three years prior to the good actually being imported into the United States." TT at 493.

35. Ford also declared assists by "looking at the total assists versus the total sales, [and] coming up with a factor, and adding that to the entry that [Ford] brought across from . . . Canada." TT at 495.

36. If Ford learned of an additional assist after the first importation, then Ford would "sweep those and file them as necessary." TT at 494.

37. On May 22, 1992, Ford submitted a letter to Customs, which it claimed was a prior disclosure relating to certain undervaluations of imported tooling assists from 1987 through 1992. See Pretrial Order, Schedule C ¶ 24; Pl.'s Ex. 22. Customs, however, did not accept the letter as a prior disclosure. See Pretrial Order, Schedule C ¶ 24. Ford stated that the tooling assists were "omitted from the dutiable values of the related parts because of inadequate instructions to certain Ford foreign suppliers." Pl.'s Ex. 22.

38. On August 6, 1992 Ford submitted a letter to Customs claiming to be a prior disclosure relating to lump sum payments for merchandise imported between 1987 and August 6, 1992. See Pretrial Order, Schedule C ¶ 39; Pl.'s Ex. 32. Ford explained that "[t]he undervaluation of these imported goods was due to

revisions to the price of these goods made subsequent to their importation and not identified by Ford and reported to U.S. Customs."  Pl.'s Ex. 32.

39.  On October 22, 1992, Ford indicated to Customs that it had manufactured developmental engine parts for engines manufactured at its Essex Engine Plant located in Canada ("Essex Plant").  See Pretrial Order, Schedule C ¶ 40.  These parts were provided free of charge to the plant and Ford had provided $1,327,455 of such parts for the 1990, 1991, and 1992 model year engines manufactured at the Essex Plant.  See id. On April 13, 1993, Ford tendered $15,920.95 for duties for these undeclared assists.  See id.; Pl.'s Ex. 26.

40.  In a letter dated November 18, 1992, Ford advised Customs that it had failed to identify in its previous reconciliation submissions all of the duties and fees owed for tooling assists for merchandise imported between January 1, 1987 through and including May 22, 1992.  See Pl.'s Ex. 23.  The total value Ford failed to declare was $41,165,251.  See id.; TT at 99.  As part of the reconciliation, Ford tendered $1,304,847.95 in duties and fees.  See Pl.'s Ex. 23; See Pretrial Order, Schedule C ¶ 24.

41.  Ford submitted a letter, dated December 16, 1992, to Customs claiming to be "a partial voluntary disclosure reconciliation of additional duties and fees owed for unreported retroactive

price adjustment payments and lump-sum payments for imported goods made during the period January 1, 1987 through various dates in July 1992." Pl.'s Ex. 33. In connection with these payments, Ford tendered $848,262.34 as unpaid duties and fees and stated that it needed further time to analyze some additional payments. See id.; Pretrial Order, Schedule C ¶ 39.

42. On January 29, 1993, Ford tendered an additional $17,888.23 for duties and fees for unreported lump sum payments for merchandise imported between 1987 and 1992. See Pretrial Order, Schedule C ¶ 39; Pl.'s Ex. 34.

43. By letter dated February 24, 1993, Ford advised Customs that it had failed to report assists paid four years earlier, in 1989, to Sheller-Ryobi, Indiana to produce prototype castings in Japan. See Pl.'s Ex. 24. In connection with these payments, Ford tendered $2,664.35 in duties and fees. See id.

44. In a letter dated April 6, 1993, Ford advised Customs that, between 1990 and 1992, it had provided assists to the Essex Plant totaling $1,327,455. See Pl.'s Ex. 25. Ford tendered $15,920.95 for duties and merchandise processing fees in connection with this merchandise. See Pl.'s Ex. 26.

45. In a letter dated February 14, 1994, Ford stated that it had discovered that it had not previously reported certain tooling assists for merchandise imported between 1987 through 1993.

See Pl.'s Ex. 27. Ford stated that "[c]ertain tooling assists may have been omitted because the country of origin for some tool orders was not coded correctly in the Ford payment records." Id.

46. In two letters dated March 17, 1994, Customs advised Ford that it would accept Ford's letters submitted on May 22, 1992, and March 1, 1993, relating to undeclared tooling and assists for the period of 1987 through 1992, as prior disclosures. See Def.'s Ex. VVV & WWW. In both instances, Customs found that the misclassification of the relevant entries was due to Ford's failure to exercise reasonable care in the preparation of the entries. See Def.'s Ex. VVV & WWW. Therefore, Customs found Ford negligent and penalized Ford the interest on the withheld duties from the date of the liquidation and the balance of withheld duties. See id.

47. By letter dated May 13, 1994, Ford advised Customs that it had failed to declare $6,674,338 in tooling assists associated with imported merchandise from 1987 through 1993. See Pl.'s Ex. 28. In connection with these assists, Ford tendered $248,215 for duties and fees. See id. Ford indicated that it had "discovered supplier location coding errors in the payment records that [led] to some tooling assists being excluded from the prior reports." Id. Ford advised Customs that it had made changes to assure that tooling assists did not go

undeclared due to supplier location coding errors in payment records. See id. Ford stated that it is "now using a tooling report that uses information drawn directly from the tool order system as well as payment record data." Id.

**D.  Findings of Fact Relevant to the Capri Investigation**

48. In April 1990, Ford began to purchase and import the Capri vehicles from Ford of Australia. See Pl.'s Ex. 57 at 2. As of July 31, 1991, Ford had imported 32,959 Capri vehicles valued at over $372,000,000. See id. In connection with the importation of the Capri vehicles, Ford filed 23 entries between April 1990 through July 1991. See Pl.'s Ex. 57 at Ex. A; Pl.'s Ex. 52 at 7; see also Pl.'s Ex. 82.

49. On September 5, 1992, Ford complied with the summons issued at the June 1991 Meeting and provided Customs with the requested documents. See Pl.'s Ex. 52 at 5. Ford provided a copy of the supply contract for the Capri vehicles, which indicated that transfer prices would be adjusted every six months to reflect increases or decreases in a market basket of similar vehicles. See Pretrial Order, Schedule C ¶ 19.

50. Ford made lump sum payments to Ford of Australia for the 1991 model year Capri vehicle, which were in addition to the payments reflected on the commercial invoices at the time of entry. See Pl.'s Ex. 8 & 57 at 4.

51. Ford disclosed these lump sum payments, totaling $5,570,900, to Customs in a letter dated August 26, 1991 and tendered a check for $155,708 for duties and fees. See Pl.'s Ex. 8; see also Pretrial Order, Schedule C ¶ 17.

**E. Findings of Fact Relevant to the Festiva Investigation**

52. Ford filed 372 entries importing Ford Festiva vehicles from Kia Motors Corporation between December 15, 1988 and August 18, 1989. See Pl.'s Ex. 1; see also Pl.'s Ex. 14. Ford purchased Festiva vehicles from KM Corporation, a trading company consisting of Kia Motors Corporation and Mazda Motor Corporation. See Pl.'s Ex. 14.

53. Customs issued a summons on March 20, 1992, requesting Ford to produce "[a]ll original records and documents related to any and all assists given and payments made by Ford Motor Company in connection with the design, development, engineering, production, purchase, and importation of Ford Festiva automobiles manufactured by Kia Motors Corporation . . . ." Pl.'s Ex. 13; See also Pretrial Order, Schedule C ¶ 20.

54. In a letter dated June 5, 1992, Ford responded to the Festiva summons and stated that "there is $11,408,470.92 of undeclared engineering and tooling cost prior to 1993 model and $309,169.56 is owed including duty and other fees." Pl.'s Ex. 12; Pretrial Order, Schedule C ¶ 25. Ford tendered the duties

and fees on April 29, 1993.  See Pretrial Order, Schedule C ¶ 25.  Ford indicated that $63,893 for duties and fees were applicable to the 1993 model year which it undertook to report 60 days after the end of the 1992 model year.  See Pl.'s Ex. 12.

55.  In a letter dated November 13, 1992, Ford advised Customs that it had failed to report, in its June 5, 1990 reconciliation, $13,358,413 paid to Kia Motors Corporation for the production shortfall of the 1990 model year Festiva.  See Pl.'s Ex. 14; Pretrial Order, Schedule C ¶ 27.  Ford tendered $362,013 in duties owed in connection with the shortfall payments.  See id.

56.  Ford and KM Corporation had a business agreement entitled Passenger Vehicle Program Agreement ("Festiva Agreement"), and dated July 1, 1988, containing an annual volume commitment clause and volume price adjustment clause.  See Pl.'s Ex. 58; Pretrial Order, Schedule C ¶ 26.  Pursuant to the annual volume commitment clause, Ford was obligated to purchase 85,000 Festivas for resale in the United States and Canada. See Pl.'s Ex. 58 at 11.

57.  Under section 2.3A of the Festiva Agreement, if the number of orders for Festivas to be delivered during any production year was between 50 and 90 percent of 85,000 vehicles, then "the purchase price for each Ford vehicle ordered for delivery"

would increase.  <u>See</u> Pl.'s Ex. 58 at 11-12.

58.  Pursuant to section 2.3B of the Festiva Agreement, if Ford ordered less than 50 percent of 85,000 Festivas, then the parties were obligated to engage in "good faith discussions." <u>See</u> <u>id.</u> at 12-13.  Either the purchase price for each vehicle would increase further, or the parties would renegotiate the terms of the contract or terminate the agreement.  <u>See</u> <u>id.</u>

59.  If Ford purchased more than the annual volume commitment by ten percent, then Ford would receive a lump sum payment from KM Corporation for the adjusted purchase price as calculated pursuant to Section 2.3C of the agreement.  <u>See</u> Pl.'s Ex. 58 at 13.

60.  The adjustments required under the Festiva Agreement were to the purchase price of each vehicle.  <u>See</u> Pl.'s Ex. 58, <u>See also</u> TT at 77-79.

61.  In a letter dated November 18, 1992, Ford advised Customs that it had made supplemental lump sum payments in the amount of $43,663,125 to Kia Motors for the 1991 and 1992 model year Festiva.  <u>See</u> Pl.'s Ex. 15; <u>See</u> TT at 84-86; Pretrial Order, Schedule C ¶ 28.  Ford tendered $1,220,384 for duties and fees associated with these payments.  <u>See</u> Pl.'s Ex. 15, Pretrial Order, Schedule C ¶ 28.

### F. Findings of Fact Relevant to the Yamaha SHO Engines Investigation

62. Ford made 322 entries for Yahama SHO engines between December 22, 1988 through December 31, 1991 at the ports of Atlanta, Georgia and Detroit, Michigan. See Pretrial Order, Schedule C ¶ 33.

63. There were three variations to the Yamaha SHO engines: (1) the 3.0 liter engine introduced with the launch of the Taurus SHO 1988 model; (2) the 3.2 liter engine introduced in July 1992 for the 1993 model year; and (3) the 3.4 liter engine that was to be introduced at the launch of the 1996 model. See Pl.'s Ex. 17.

64. By letter dated January, 31, 1991, Ford advised Customs that it had made supplemental lump sum payments of $5,762,129 to Ford of Germany for the 1990 model year 2.9 liter V-6 engines. See Def.'s Ex. LL. In connection with these payments, Ford tendered $190,727 for duties and fees. See id. Ford also advised Customs that it had made supplemental lump sum payments of $77,217,109 to Ford of Germany for 1990 model year 4.0 liter V-6 engines. See Def.'s Ex. MM. In connection with these payments, Ford tendered $2,128,953 for duties and fees. See id.

65. In a letter dated January 31, 1991, Ford advised Customs that it had made supplemental lump sum payments of $58,457,120 to

Ford of France for the 1990 model year A4LD Bordeaux transmissions. See Def.'s Ex. NN. Ford tendered $1,665,215 for duties and fees in connection with these payments. See id.

66. Customs issued a summons on January 22, 1992, requesting Ford to produce "[a]ll original records and documents related to any and all assists given and payments made by Ford," in connection with automobile engines manufactured by the Yamaha Motor Co., Ltd. for the Taurus SHO automobile. See Pl.'s Ex. 18; TT at 88-89; see also Pretrial Order, Schedule C ¶ 29.

67. Ford's response to the summons, on June 5, 1992, indicated that the value declared for the 3.0 liter engine had been $15,100,449 but that the total value had been $15,387,841. See Pl.'s Ex. 17 at 3. Accordingly, Ford advised Customs that it was liable for $287,112 in undeclared value for the 3.0 liter engine. See id. at 3-4; Pretrial Order ¶ 30. Ford tendered an additional $9,623.16 for duties and fees owed in connection with Customs' investigation of the 3.0 liter engine. See Pl.'s Ex. 21; Pretrial Order, Schedule C ¶ 30. Ford also informed Customs that there were $14,779,026 in prototype and development costs for the 3.2 liter SHO engine for the 1993 model year, which would be declared 60 days after the end of the 1992 model year. See Pl.'s Ex. 17; See Pretrial Order, Schedule C ¶ 32.

68. Ford also provided Customs with a copy of its supply agreement, indicating that the base price for the SHO engines could be adjusted. See Pretrial Order, Schedule C ¶ 31.

69. In a letter dated November 13, 1992, Ford identified $2,158,417 in retroactive payments it made between 1987 through 1991 for the 3.0 liter engines, which it had failed to include in its June 5, 1992, reconciliation. See Pl.'s Ex. 19; see also Pretrial Order, Schedule C ¶ 34. Ford tendered $59,707 for duties and fees in connection with these lump sum payments. See Pl.'s Ex. 19.

70. In a letter dated November 18, 1992, Ford tendered $404,100 for duties associated with lump sum payments of $14,274,097 related to design and development costs for the 3.2 liter SHO engines made during 1991 and 1992. See Pl.'s Ex. 20; Pretrial Order, Schedule C ¶ 35. Ford also indicated that at the end of the 1993 model year it would reconcile actual usage and tender additional money owed or request a refund based on actual occurrences during the 1993 model year. See Pl.'s Ex. 20; Pretrial Order, Schedule C ¶ 35.

71. In a meeting with Customs Import Specialist Spiro Karras held on December 18, 1992, Ford admitted that it had not declared development costs apportioned to Yamaha prototype 3.2 liter SHO engines that were to be retained in Japan rather than shipped to the United States. See Pretrial Order, Schedule C

¶ 36.  Ford sought advice from Customs' Office of Regulations and Rulings ("Customs' OR&R") on March 26, 1993.  See id. Ford was advised that the development costs should be apportioned over the imported production engines.  See id.; Pl.'s Ex. 59 at 5.  Customs' OR&R advised Ford that the payment for development and design costs were attributable to the production of engines and, therefore, constituted the price actually paid or payable for the 3.2 liter SHO engines. See Pl.'s Ex. 59 at 5.  Ford has not tendered $68,178 of alleged duties owed on the undeclared development costs for 3.2 liter SHO engines.  See Pretrial Order, Schedule C ¶ 37.

**G.    Findings of Fact Relevant to Customs Investigation of Engines From Germany and Transmissions from France**

72.  Prior to the commencement of Operation Hat Trick, Ford filed a voluntary disclosure on August 3, 1988, relating to undeclared lump sum payments made to Ford of France and Ford of Germany.  See Pl.'s Ex. 1 at 22; Joint Ex. 2 at Z.  In a letter dated October 3, 1988, Ford tendered duties and fees in connection with these payments.  See Joint Ex. 2 at Z.  Ford informed Customs that it had taken corrective action and that its accounting services had been instructed to provide copies of all debit and credit memoranda it processed.  See id.; TT at 255-56.

73. In letters dated March 23, 1992, Ford advised Customs that lump sum payments totaling $21,401,808 and $32,130,256 had been made to Ford of Germany for 1991 model year 2.9 liter and 4.0 liter V-6 engines, respectively. See Pretrial Order, Schedule C ¶ 21-22; Pl.'s Ex. 29 & 31. Ford tendered $726,591 and $1,047,074, respectively, for duties and fees associated with these payments. See Pretrial Order, Schedule C ¶ 21-22; Pl.'s Ex. 29 & 31.

74. Ford informed Customs, in a letter dated May 6, 1993, that it had made lump sum payments to Ford of Germany totaling $4,783,094 for 1991 model year 2.6 liter V-6 engines. See Pretrial Order, Schedule C ¶ 42; Pl.'s Ex. 36. Ford tendered $162,625 for duties and fees in connection with these payments. See Pl.'s Ex. 36.

75. Ford disclosed on May 6, 1993, that it had made lump sum payments to Ford of Germany for 1992 model year 4.0 liter V-6 engines in the amount of $25,782,651. See Pl.'s Ex. 35; Pretrial Order, Schedule C ¶ 43. Ford tendered $695,874 in unpaid duties and fees in connection with these payments. See Pl.'s Ex. 35.

76. On May 28, 1993, Customs issued a summons to Ford requesting "documents and information regarding 'lump sum payments' on engines imported from Ford of Germany for the period January 1990 to the present . . . ." Pl.'s Ex. 39; see also Pretrial

Order, Schedule C ¶ 45.

77. In a letter dated August 9, 1993, Ford responded to Customs' summons. See Pl.'s Ex. 38. Ford adjusted the 1990 submission data relating to 1990 model year V-6 engines from Germany resulting in additional duties and fees of $73,635.13, which Ford tendered. See id.; TT at 258.

78. By letter dated March 23, 1992, Ford informed Customs that it had made lump sum payments in the amount of $10,875,431 to Ford of France for 1991 model year A4LD Bordeaux transmissions. See Pretrial Order, Schedule C ¶ 23; Pl.'s Ex. 30. Ford tendered $339,379 for duties and fees in connection with these payments. See Pl.'s Ex. 30.

79. Ford informed Customs by letter, dated May 6, 1993, that it had made lump sum payments to Ford of France in the amount of $16,359,794 for 1992 model year A4LD Bordeaux transmissions and tendered $458,893 for unpaid duties and fees. See Pl.'s Ex. 37; Pretrial Order, Schedule C ¶ 44.

80. Ford informed Customs by letter dated September 2, 1993, that the value of certain lump sum payments relating to transmissions imported from Ford of France for the 1989 through 1992 model year were not reported to Customs because of "incorrect currency exchange rates applied at the time of payment, missing billing invoices and a change in Ford's internal tracking/reporting process from manual to a

mechanized procedure." Pl.'s Ex. 42.

81. In a letter dated December 1, 1993, Ford explained how it calculated duties and fees it owed on the additional payments referred to in its September 2, 1993, letter. See Pl.'s Ex. 43. Ford determined that it had not declare $4,973,042 of value upon entry of the merchandise. See id.; Pretrial Order, Schedule C ¶ 47. Ford calculated that it owed $113,387.68 for duties and fees and tendered a check to Customs in that amount. See id.

**H.    Ford's Compliance Measures**

82. After the June 1991 Meeting, Ford undertook a review of earlier post-entry submissions and tenders dating from 1987 through 1992 ("Five Year Look Back"). TT at 446-48. Mr. Cohen testified that the Five Year Look Back was not in response to a summons.[3] See TT at 447. Mr. Gibson testified that the review did not occur after Ford was notified of Customs' investigation. See TT at 503-04. No testimony or documentary evidence was presented at trial to support the conclusion that Ford had undertaken a Five Year Look Back prior to the commencement of Customs' investigation or that it has undertaken such a review with regard to any other program

---

[3]    When asked when the reviews began, Mr. Cohen did not recall if it was before or after the commencement of Customs' investigation. See TT at 447.

that was not within the scope of Customs' investigation.  The Court finds the testimony of Messieurs Cohen and Gibson incredible and finds that the Five Year Look Back was in response to Customs' investigation of Ford.

83.  Ford had a Customs compliance manual which instructed Ford employees on how to properly file documents for imported goods.  See TT at 422; Joint Ex. 2 at G.

84.  Ford's compliance manual states that, "[t]he invoice must be priced so that the true value can be ascertained.  In the event that the value is not completely and correctly shown, a 'provisional' disclaimer is stated on the invoice, thereby advising customs."  Joint Ex. 2 at G at 12.  The manual further explains that Ford is required to report to Customs all extraneous dutiable payments that affect the original entered value of the imported merchandise.  See Joint Ex. 2 at G.  Examples of extraneous payments list in the manual may be in the form of: (a) retroactive adjustments; (b) lump sum payments for engineering and manufacturing expenses; ©) adjustments for currency fluctuations; or (d) volume price adjustments.  See id.

85.  Ford sent a draft copy of the manual to Customs for review and comment.  See TT at 423.  Customs offered several suggestions, which Ford subsequently incorporated in its final manual.  See Def.'s Ex. H; TT at 423 & 425.

86. During the relevant time period, Ford had training videos, a Customs compliance hotline, and held seminars and meetings to make its employees aware of their responsibilities with regard to complying with Customs' laws and regulations. See Def.'s Ex. J, K, & L; see also TT at 381 & 425-28.

87. Ford received a letter from Customs' regional director, in September 1988, commending Ford "for recognizing the importance of complying with Customs' regulations and taking constructive and positive steps to educate other members of the Ford Motor Company community in these matters." Def.'s Ex. Q.

88. Ford's purchasing and finance departments were instructed to provide Ford's customs unit "with copies of anything that might impact the cost of the goods." TT at 437. Every Ford employee in the purchasing department involved in overseas purchases was instructed to provide a copy of the purchase order to Ford's International Transportation and Customs Office. See Joint Ex. 2 at 19. The employees of Ford's purchasing unit, however, did not always comply with these instructions. See id.

89. Ford's customs unit "had to rely on the procedures in place at the time that we were to get a copy of the purchase order, period." Joint Ex. 2 at 30. If a purchase order was not sent to Ford's customs unit then it would not know what was being

imported.  <u>See</u> <u>id.</u> at 31.  Ford's customs unit knew that Ford's purchasing unit's failure to provide it with purchase orders would open Ford to liability for failure to report dutiable payments.  <u>See</u> <u>id.</u>

90.  After Operation Hat Trick had commenced, Ford proposed to Customs a change in its methodology for reporting dutiable assists.  <u>See</u> Def.'s Ex. V.  In a letter dated August 26, 1992, Ford advised Customs that it "would like to discontinue reporting assist values at the time of the first importation of the applicable goods."  <u>Id.</u>  Instead, Ford proposed to provide Customs with information on potential assists before importation, in July for the upcoming year, and report and tender duties on such assists in December of the following year.  <u>See</u> <u>id.</u>  Customs, in a letter dated February 1, 1993, accepted Ford's proposal to change its methodology of reporting assists.  <u>See</u> Def.'s Ex. W.

91.  In a report dated October 27, 2000, Customs assessed Ford's compliance and import practices beginning in 1995.  <u>See</u> Joint Ex. 1 at Ex. 114.  Customs' audit of Ford found that "Ford lacked adequate internal control procedures in . . . verifying the reliability of their brokers' work [and] . . . ensuring the reporting of correct values on entries . . . ."  <u>Id.</u> Customs, found, however, that Ford "has attempted to improve their Customs compliance through their involvement in various

other programs." <u>Id.</u> Based on corrective action taken by Ford, Customs' Compliance Assessment Team recommended that "Ford's imports . . . should receive the level of cargo examinations and document reviews associated with companies that pose a low risk." <u>Id.</u>

## II. Conclusions of law

The Court has jurisdiction of this matter pursuant to 28 U.S.C. § 1582 (2000).[4] In actions brought for the recovery of any monetary penalty claimed under section 592 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1592, all issues are tried <u>de novo</u>, <u>see</u> 28 U.S.C. § 2640(a)(6) (2000), including the amount of the penalty. <u>See</u> 19 U.S.C. § 1592(e)(1). The level of culpability has a direct correlation to the maximum amount of penalty that can be assessed. <u>See</u> 19 U.S.C. § 1592©).

---

[4] The relevant portions of the statute state:

The Court of International Trade shall have exclusive jurisdiction of any civil action which arises out of an import transaction and which is commenced by the United States—

(1) to recover a civil penalty under section 592 . . . of the Tariff Act of 1930 . . .
(3) to recover customs duties.

28 U.S.C. § 1582.

Customs has alleged that Ford violated 19 U.S.C. § 1592, thereby depriving the United States of all or a portion of lawful duty through grossly negligent or, in the alternative, negligent conduct.  See Compl.  In pertinent part, 19 U.S.C. § 1592(a) states:

> Without regard to whether the United States is or may be deprived of all or a portion of any lawful duty thereby, no person, by fraud, gross negligence, or negligence–
>     (A)  may enter, introduce, or attempt to enter or introduce any merchandise into the commerce of the United States by means of–
>         (I)  any document, written or oral statement, or act which is material and false, or
>         (ii) any omission which is material.

19 U.S.C. § 1592(a).  An act or omission is deemed material if it has the potential to alter the appraisement or liability for duty. See 19 C.F.R. pt. 171, App. B(A) (1992).  The issue of materiality is for the Court to determine.  See United States v. Hitachi Am., Ltd. ("Hitachi I"), 21 CIT 373, 386, 964 F. Supp. 344, 360 (1997), aff'd in part and rev'd in part on other grounds, 172 F.3d 1319 (Fed. Cir. 1999); see also United States v. Rockwell Int'l Corp., 10 CIT 38, 42, 628 F. Supp. 206, 210 (1986) (stating that "the measurement of the materiality of the false statement is its potential impact upon Customs' determination of the correct duty for the imported merchandise").

As a threshold issue, Ford asserts that Customs failed to offer into evidence entries related to the subject merchandise,

except for the Capri vehicle and Yamaha SHO engine entry documents. See Def.'s Post-Trial Br. at 16-17. Ford argues that, without the entries admitted into evidence, the Court has no means of evaluating Customs' claim that the entered values were false or that Ford failed to notify Customs that the prices reflected therein were not final. See id. Ford's argument is flawed because the statutory language contemplates violations where the importer has either made material omissions or failed to act. Accordingly, an importer may violate the statute by failing to provide Customs with entry documents in the first place. Pursuant to Ford's argument, Customs would be precluded from successfully bringing an action pursuant to 19 U.S.C. § 1592 in instances where entry documents or specific entry information was never submitted to Customs. This reasoning is untenable and contradicts the plain language of the statute.

The totality of the evidence submitted at trial provides the Court with enough evidence of the values Ford declared on its entry documents. Therefore, such documents need not be introduced and admitted into evidence. The testimony of Ford's own witnesses established its failure to declare assists at entry and Ford's failure to alert Customs "at once" of dutiable lump sum payments made after entry. See e.g. Pl.'s Ex. 12, 14, 15, 16, 17, 19, 23, 24, 25, 28, 29, 30, 31, 33, 35, 36 37; See also TT at 402-03; 435-

36, 488. Such failures and acts may be found by a trier of fact to constitute gross negligence or negligence in violation of 19 U.S.C. § 1592. Based on the testimony and evidence presented at trial, the Court finds that there is sufficient evidence to evaluate Customs' claim that values appearing on Ford's entry documents were false or that Ford failed to notify Customs that the prices reflected therein were not final.

### A. Customs Failed to Establish by a Preponderance of the Evidence that Ford's Conduct Was Grossly Negligent

#### 1. Statutory Background

Gross negligence arises "if it results from an act or acts (of commission or omission) done with actual knowledge of or wanton disregard for the relevant facts and with indifference to or disregard for the offender's obligations under the statute." 19 C.F.R. pt. 171, App. B(C)(2). A finding of gross negligence requires the Court to determine that Ford's omissions of information from entry documents and its failure to comply with its statutory obligations was willful, wanton or reckless or that the evidence before the Court illustrates Ford's utter lack of care. See Mach. Corp. of Am. v. Gullfiber AB, 774 F.2d 467, 473 (Fed. Cir. 1985) (citation omitted). Gross negligence involves a type of intent which is a question of fact and not law. See United States v. Hitachi Am., Ltd., 172 F.3d 1319, 1326 (Fed. Cir. 1999); see also Allen Organ Co. v. Kimball Int'l, Inc., 839 F.2d 1556, 1567

(Fed. Cir. 1988) (stating that "intent is a factual determination particularly within the province of the trier of fact").

Customs bears the burden of establishing all the elements of the alleged violation. See 19 U.S.C. § 1592(e)(3). Customs must establish such elements by a preponderance of the evidence, which "is the general burden assigned in civil cases for factual matters." St. Paul Fire & Marine Ins. Co. v. United States, 6 F.3d 763, 769 (Fed. Cir. 1993). Preponderance of the evidence is "the greater weight of evidence, evidence which is more convincing than the evidence which is offered in opposition to it." Id. (quoting Hale v. FAA, 772 F.2d 882, 885 (Fed. Cir. 1985)). Based on the testimony and documents submitted during trial, the Court finds that Customs has failed to meet its burden of proof.

### 2. Discussion

Customs has not established that Ford acted with a wanton disregard for the relevant facts and with indifference to or disregard for its obligations under 19 U.S.C. § 1592. During the relevant time period, Ford had a customs compliance manual setting forth the duties of its employees for reporting dutiable values to Customs. See TT at 422; Joint Ex. 2 at G. Customs reviewed Ford's manual and made several comments and recommendations, see Def.'s Ex. H, which Ford subsequently incorporated into its compliance manual. See TT at 423 & 425. Moreover, Ford produced training

videos, see Def.'s Ex. J, K & L, maintained a compliance hotline and held seminars and meetings relating to Ford's compliance with Customs' rules and regulations. See TT at 381 & 421-28. The evidence showed that Ford had mechanisms in place which enabled it to comply with its statutory obligations to properly enter merchandise. See Joint Ex. 2 at R, Z, CC, DD, EE, II, JJ, KK.

The mere existence of such mechanisms, however, does not completely prevent Customs from establishing that Ford was grossly negligent. Customs may meet its burden by demonstrating that Ford disregarded or was indifferent to the internal compliance measures it put into place. Ford's compliance measures relieve Ford from gross negligence liability only if (a) such mechanisms set forth procedures and guidelines that, if followed, ensured Ford's fulfillment of its statutory duties, and (b) Ford made a good faith effort to follow its internal compliance measures. Ford satisfied the first requirement. Customs' positive review of Ford's compliance manual established that Ford's compliance mechanisms would allow Ford to meet its statutory obligations. See TT at 423 & 425, Def's Ex. H. The Court, therefore, must determine whether Ford made a good faith attempt to implement and follow its internal compliance measures.

Based on the testimony and documentary evidence produced, the Court finds that Customs failed to establish by a preponderance of

the evidence that Ford did not make a good faith effort to follow its internal compliance measures or statutory obligations. Ford's submission of reconciliation reports illustrates Ford's understanding of its duty to report additional transaction values incurred after entry. See e.g., Pl.'s Ex. 8, 12, 19. Ford actively tried to fulfill its duty under 19 U.S.C. § 1485 to inform Customs of changes to the value declared on its entry documents. Credible evidence was admitted at trial showing that Ford attempted to reconcile the difference between the prices reported to Customs at the time of entry and the final price paid. See e.g., Pl.'s Ex. 8, 12, 14, 15, 16, 17, 19, 30, 31, 32, 33, 35, 36, 37. In October 1988, Ford proposed the Reconciliation Agreement as a means of increasing the efficiency of reporting lump sum payments to Customs. See Pl.'s Ex. 55. Ford indicated that the proposed changes would aid both Customs and Ford by reducing paperwork and the amount of time needed to report lump sum payments. See id. Ford undertook to report lump sum payments on an annual basis. See id. From about 1990 through 1993, Ford had an employee, Ms. Monro, who was responsible for implementing Ford's lump sum reconciliation program. See TT at 381. Ford submitted reconciliation reports to Customs when it failed to capture certain lump sum payments or assists. See TT at 381-82, 471, 474-75; Joint Ex. 2 at Z; See e.g., Pl.'s Ex. 8, 12, 14, 15, 16, 17, 19, 23, 24, 25, 28, 29, 30, 31, 32, 33, 35, 36, 37. Accordingly, Ford's attempt to reconcile

the price paid with the price reported at entry demonstrates that Ford did not act with wanton disregard or indifference to its statutory obligations, which were set forth in its compliance manual.

A showing of utter lack of care would have required Customs to establish that Ford made no attempt to meet its statutory obligations. To meet its burden of proof, Customs had to demonstrate Ford's failure to act upon relevant facts indicating that Ford's entry procedures were deficient. Ford's attempt to reconcile the price actually paid and the price declared at entry along with the training videos, customs compliance hotline, and seminars relating to customs compliance illustrates that Ford did not act with wanton disregard or indifference to its internal compliance program. The testimony and documentary evidence simply does not establish Ford's grossly negligent conduct. The evidence failed to establish Ford's indifference to make material omissions from the entry documents. The evidence also failed to establish that Ford exhibited an utter lack of care. Accordingly, the Court concludes that Customs failed to carry its burden to show that Ford's violation of 19 U.S.C. § 1592 was a result of grossly negligent conduct.

B.    **Customs Established Ford's Negligence by a Preponderance of the Evidence and Ford Failed to Demonstrate it Exercised Reasonable Care**

1.    **Statutory Background**

Negligence arises out of "an act or acts (of commission or omission) done through either the failure to exercise the degree of reasonable care and competence expected from a person in the same circumstances in ascertaining the facts or in drawing inferences therefrom . . . ."    19 C.F.R. pt. 171, App. B(B)(1). Consequently, negligence does not require the trier of fact to determine intent.    Section 1592(e)(4) of Title 19 of the United States Code derogates from common law negligence (i.e., duty, breach, causation, and injury) by shifting the burden of persuasion to the defendant to show lack of negligence. See Hitachi I, 21 CIT at 380, 964 F. Supp. at 355.    The statute removes the breach element from Customs' prima facie negligence case.    See id. Accordingly, Customs must establish by a preponderance of the evidence that the materially false act or omission occurred. See 19 U.S.C. § 1592(e)(3).    Once Customs has met its burden, Ford bears the burden to establish that it exercised reasonable care under the circumstances and that the alleged violation was not caused by its negligence. See 19 U.S.C. 1592(e)(3); 19 C.F.R. pt. 171, App. B; see also Hitachi I, 21 CIT at 381, 964 F. Supp. at 355-56.

Customs is directed to appraise imported merchandise based on the transaction value. See 19 U.S.C. § 1401a(a)(1) (1988). The statute defines transaction value as "the price actually paid or payable for the merchandise when sold for exportation to the United States, plus amounts equal to . . . the value, apportioned as appropriate, of any assist . . . ." 19 U.S.C. § 1401a(b)(1). Under 19 U.S.C. § 1481(a), all invoices for imported merchandise are required to set forth, inter alia, the purchase price of each item. See 19 U.S.C. § 1481(a)(5) (1988). The statute also states that the invoices must contain any facts required to properly appraise the merchandise. See 19 U.S.C. § 1481(a)(10). An importer must file at the time of entry appropriate documentation enabling Customs to properly assess duties. See 19 U.S.C. § 1484(a)(1)(B); see also United States v. Thorson Chem. Corp., 16 CIT 441, 448, 795 F. Supp. 1190, 1195 (1992) (noting that defendant had a "legal obligation pursuant to the statute to file appropriate documentation permitting Customs to properly assess duties and determine whether any other applicable requirement of law is met") (citation omitted). Furthermore, an importer making an entry must file a declaration under oath stating that "the prices set forth in the invoice are true, in the case of merchandise purchased or agreed to be purchased . . . [and that] all other statements in the invoice or other documents filed with the entry, or in the entry itself, are true and correct . . . ." 19 U.S.C. § 1485(a)(2) &

(3). The importer must also declare "[t]hat he will produce at once to the appropriate customs officer any invoice, paper, letter, document, or information received showing that any such prices or statements are not true or correct." 19 U.S.C. § 1485(a)(4).

## 2. Discussion

The Court finds that Customs established, by a preponderance of the evidence, that Ford failed to exercise reasonable care expected from a person in the same circumstances. See 19 C.F.R pt. 171, App. B (C)(1). Testimonial and documentary evidence presented at trial established that Ford had made assists between 1987 through 1992, which it failed to declare on its entry documents or "at once" thereafter. See e.g., Pl.'s Ex. 23, 24, 25, 28, 29; see also TT at 493. Ford also failed to declare on its entry documents that the values stated therein were not final because Ford was obligated to make lump sum payments to its vendors after entry. Furthermore, Ford failed to report these lump sum payments "at once" pursuant to 19 U.S.C. § 1485 or the Reconciliation Agreement. See e.g., Pl.'s Ex. 12, 14, 15, 16, 17, 19, 30, 31, 33, 35, 36, 37; see also TT at 402-03; 435-36, 488.

### a.  Ford's Failure to Declare Assists at Entry Violated 19 U.S.C. §§ 1484 & 1485

### 1.  Customs Satisfied its Burden of Proof

The Court finds that Customs met its burden of proof and established that Ford made materially false statements or omissions in its entry documents related to tooling assists provided for certain vehicles and vehicle components thereby violating 19 U.S.C. § 1484.  See Pl.'s Ex. 22, 23, 24, 25, 27, 28.  Based on testimony and documentary evidence, the Court finds that Ford's omission of assists on the entry documents had a material impact on Customs' ability to properly determine the dutiable value of the relevant merchandise.  See Rockwell, 10 CIT at 42, 628 F. Supp. at 210. Based on uncontroverted evidence, the Court further concludes that Ford knew or should have known that it had incurred expenses for assists prior to importation, see TT at 493, but failed to report such assists as part of the transaction value in its entry documents.  See 22, 23, 24, 25, 27, 28.

Customs also established that Ford violated 19 U.S.C. § 1485 by failing to advise Customs "at once" that it had provided such tooling assists.  Ford advised Customs, on several occasions, that it had failed to capture additional duties and fees on its entry documents relating to tooling assists provided by Ford.  See Pl.'s Ex. 22, 23, 25, 27, 28.  On one occasion, Ford indicated that it

had failed to include tooling assists "from the dutiable values of the related parts because of inadequate instructions to certain Ford foreign suppliers." Pl.'s Ex. 22. Ford, on a different occasion, indicated that it had failed to include certain tooling assists in the dutiable values "because the country of origin for some tool orders was not coded correctly in the Ford payment records." Pl.'s Ex. 27. Ford's lack of reasonable care to report the assists in the entry documents and invoices constitutes materially false statements or omissions arising out of Ford's negligence. See 19 C.F.R. pt. 171, App. B(B)(1).

Moreover, the evidence established that Ford failed to "at once" notify Customs that the entry values included assists. The documentary evidence demonstrates that Ford advised Customs of the assists well after entry. For example, in a letter dated April 6, 1993, Ford advised Customs that it had provided $1,327,455 of value to the Essex Plant free of charge for the 1990, 1991, and 1992 calendar years. See Pl.'s Ex. 25. Ford's disclosure of the assists came almost three years after the first assists had been incurred. See id. Ford's failure to capture assists at entry or when they were incurred is unreasonable and violated the plain language of 19 U.S.C. § 1485, which requires an importer to report changes in value declared at enrty "at once."

## 2.    Ford Failed to Satisfy its Burden of Proof

Customs satisfied its burden of proof, thereby shifting the burden to Ford to establish that it exercised reasonable care under the circumstances and that the violations were not the result of its negligence. See 19 U.S.C. § 1592(e)(4). From all the evidence presented on the reporting of assists by Ford, the Court concludes that Ford failed to meet its burden.  There was uncontroverted evidence that Ford knew that assists "start to occur in Ford's major programs sometimes two, three years prior to the good actually being imported into the United States." TT at 493.  Ford had a compliance program in place to report assists. See TT at 421, 442, 493-94.  If Ford learned of additional assists after the first importation, then Ford would report such assists to Customs in a subsequent reconciliation. See TT at 494.

The evidence established, however, that Ford failed to follow its own policies.  Ford argues that "throughout the period at issue in this action Ford had procedures in place that satisfied Customs' reporting requirements which were ignored by the Customs Agents." Def.'s Post-Trial Br. at 23.  There was documentary evidence presented at trial that Ford reported to Customs its failure to initially capture assists upon entry of the merchandise. See e.g., Pl.'s Ex. 22, 23, 24, 25.  Ford, however, did not establish that it exercised reasonable care to report such assists which, in some

cases, related to merchandise imported over five years before Ford's notification of Customs. See e.g., Pl.'s Ex. 28. Ford did not present corroborating evidence that it reported such assists in a timely fashion and therefore met the requirement of 19 U.S.C. § 1485. Moreover, Ford failed to establish through testimony or documentary evidence that its assist reporting program, if followed, would have satisfied Ford's statutory obligations with respect to making entries in accordance with law.

Ford asserts that "it was common practice for Customs to issue CF 28's requesting information about assists and to accept the resulting tenders without further action." Def.'s Post-Trial Br. at 22. While Customs may have used CF 28s to gather relevant information regarding assists, the burden to report such assists remains with the importer. See 19 U.S.C. §§ 1401a(b)(1) & 1481(a)(5). Ford's customs compliance manual explains that the basis for Customs' collection of duty is the value of the entered merchandise, which includes assists provided by Ford. See Joint Ex. 2. Nonetheless, Ford failed to advise Customs at the time of entry that it had provided assists. See Pl.'s Ex. 22, 23, 24, 25, 27, 28.

Ford was required to file a declaration under oath stating that the prices set forth in the entry documents were true and correct. See 19 U.S.C. § 1485(a)(2) & (3). Ford, however, did not

present the Court with evidence that it provided Customs with true and accurate information.  See <u>United States v. Nippon Miniature Bearings, Corp.</u>, 25 CIT 638, 641, 155 F. Supp. 2d 701, 705 (2001) (stating that "the burden is on the importer to provide true and accurate information to Customs; the burden is not on Customs to 'find out' non-complying importers").  Based on the evidence submitted, the Court finds that Ford's failure to report assists at the time of importation, in accordance with 19 U.S.C. § 1484, had a material impact on Customs' ability to properly determine the dutiable value of the relevant merchandise.  Furthermore, Ford failed to report changes in the entry values "at once," in accordance with 19 U.S.C. § 1485.  Accordingly, the Court holds that Ford's failure to report assists in its entry documents or "at once" resulted from Ford's negligent conduct.  Ford, therefore, violated 19 U.S.C. § 1592.

### b.   Ford's Failure to Declare Lump Sum Payments

#### 1.   Ford's Material Omissions Violated 19 U.S.C. § 1484 and was the Result of Ford's Negligence

Customs met its burden of proof and established that Ford made materially false statements or omissions in its entry documents relating to lump sum payments it made in connection with certain vehicles and vehicle components.  The court in <u>Hitachi</u> held that "importers are required to disclose escalation clauses in entry documents . . . ."  <u>Id.</u> 21 CIT at 387-88, 964 F. Supp. at 360-61

(stating that the importer's omission on entry documents of escalation clauses affecting price "had a potential impact on the correct duty and thus perpetrated a material omission"). In the case at bar, Ford presented no evidence that it disclosed escalation clauses on its entry documents in accordance with 19 U.S.C. § 1484.

The evidence demonstrated that Ford violated the statute by failing to notify Customs of potential post-entry lump sum payments. Customs offered unrebutted evidence that Ford knew at the time of importation that the cost of certain vehicles and vehicle components were subject to change. See TT at 492 & 512. Ford had supply agreements with many of its foreign vendors which contained post-importation price adjustments. See Pretrial Order, Schedule C ¶ 1. These supply agreements were negotiated prior to the shipment of the merchandise. See TT at 512. Under the terms of the supply agreements, however, Ford did not know the amount of the payments required. See TT at 382. While Ford became aware of the amount of these payments subsequent to the entry of the merchandise, Ford failed to notify Customs on the entry documents that it anticipated making lump sum payments. See e.g., Pl.'s Ex. 81 & 82.

The evidence established that Ford's omissions deprived Customs of information required to determine whether or not to

extend the statutory period for liquidation. See 19 C.F.R. § 159.2 (1992) (stating that "[a]ll entries covering imported merchandise . . . shall be liquidated"). Under Customs' regulations, "an entry [that is] not liquidated within 1 year from the date of entry of the merchandise . . . shall be deemed liquidated by operation of law at the rate of duty, value, quantity, and amount of duties asserted at the time of filing an entry summary for consumption in proper form with estimated duties attached. . . ." 19 C.F.R. § 159.11. However, Customs may extend liquidation for an additional period of time if "[i]nformation needed by Customs for the proper appraisement . . . is not available." 19 C.F.R. § 159.12. Accordingly, Ford's omissions in its entry documents impinged on Customs' ability to properly assess duties on the subject merchandise or to withhold liquidation until the transaction values on the entry summaries became final. See 19 U.S.C. § 1484(a)(1)(B); see also Thorson, 16 CIT at 448, 795 F. Supp. at 1196.

Although Customs established Ford's material omissions from entry documents, Ford is afforded an opportunity to rebut Customs allegations by establishing that it exercised reasonable care. See 19 U.S.C. § 1592(e). The Court, however, concludes that Ford has failed to meet its burden. There is no evidence before the Court that Ford took action to notify Customs that the transaction values

contained in the entry documents were subject to change. Ford argues that it was not required under the applicable law to disclose that the transaction values were subject to change due to post-entry price adjustments. See Def.'s Post-Trial Br. at 17. Ford asserts that, pursuant to 19 U.S.C. § 1484(a)(1)(b), it was merely required to file documentation "necessary for the assessment of duties and collection of statistics on the merchandise." Id. Ford further argues that the Reconciliation Agreement placed Customs on notice that it would have post-entry price adjustments. See id. at 19-20. Accordingly, Ford argues that it met its statutory obligations or alternatively that it exercised reasonable care under the circumstances.

The evidence presented and facts found by the Court demonstrate that Ford failed to exercise reasonable care and, therefore, acted with negligence. Ford failed to alert Customs that the values declared at entry were not final values. See TT at 410 & 491, See e.g., Pl.'s Ex. 81 & 82. Furthermore, in letters Ford sent to Customs between August 1991 through December 1993, Ford repeatedly advised Customs that lump sum payments had not been declared on the entry documents. See Pl.'s Ex. 8, 12, 14, 15, 17, 19, 20, 29, 30, 31, 32, 33, 35, 36, 37, 38, 42, 43. Ford also failed to indicate on the entry documents that its transaction values were not final. See e.g., Pl.'s Ex. 81 & 82. Ford may not

shirk its statutory obligations under 19 U.S.C. § 1484 and place

the blame for its failure to meet those obligations with Customs.

Ford did not offer evidence to suggest that its failure to comply

with the statute was not due to its failure to exercise reasonable

care.  On the contrary, there was uncontroverted testimony that

Ford knew that the prices paid to its vendors for vehicles and

vehicle components were subject to change. See TT at 492.  While

it was reasonable for Ford to enter the merchandise with the

transaction values known at the time of entry, the Court finds that

Ford's failure to place Customs on notice that such values were not

final is unreasonable. If Ford had exercised reasonable care under

the circumstances, then Ford would have followed its own internal

procedures and alerted Customs at entry that the transaction values

were provisional. See Joint Ex. 2 at G.

The lump sum payments Ford made to its vendors after entry are

analogous to the escalation payments made by the importer in

Hitachi.  While the importer in Hitachi escaped liability because

a Customs ruling clouded the importer's duties, Ford has failed to

establish that its duties were nebulous in the present case.[5]  With

---

[5]     The court in Hitachi, determined that the importer could
"not be held liable [for violating 19 U.S.C. §1484] because Customs
confused the obligation by virtue of its own published rulings."
Hitachi, 21 CIT at 388, 964 F. Supp at 361.  Customs had issued a
ruling in which it stated that if an importer has an agreement
whereby the price actually paid or payable may change, than the
importer should preferably advise Customs of such an agreement at

respect to Ford's argument that the Reconciliation Agreement placed Customs on notice that its entry values were provisional, the Court finds this contention, at best, tenuous. If Ford's argument were to be adopted, then every single entry Ford made would have been provisional and not final. Furthermore, the Reconciliation Agreement did not identify specific entries, if any, to which it applied. Consequently, Customs would never know when to hold liquidation open or liquidate entries. Ford's logic is inapposite to the plain language of the statute because it would require Customs to guess which entry documents contain final transaction values and which entry values were subject to change because of contract provisions Ford had with its vendors. The statute encumbers the importer with the responsibility of ensuring that information contained in entry documents is true and correct. See 19 U.S.C. § 1485(a)(2) & (3). The statute required Ford to put Customs on notice for each entry made. See id. It is unreasonable for Ford to have relied on the Reconciliation Agreement to place Customs on notice for every entry Ford made.

Customs does not allege that Ford declared inaccurate values on its entry documents. Rather, Customs alleges that Ford failed

_____

the time of entry. See id. The Court held that Customs' ruling, in the absence of a subsequent ruling, "clouded the existence and exigency of the requirement [to report escalation clauses at entry], and a nebulous duty is a legal oxymoron." Id.

to fulfill its statutory obligations to place Customs on notice that such prices were provisional. There was uncontroverted evidence that Ford failed to place Customs on notice that the transaction values set forth in the entry documents were subject to change, and, therefore, not final transaction values. See TT at 410 & 491; See e.g., Pl.'s Ex. 81 & 82. Accordingly, the Court concludes that Ford's omission of material facts from its entry documents was a result of its negligent conduct. The Court holds that 19 U.S.C. § 1484 required Ford to indicate on the entry documents that transaction values were not final because, under pre-existing contracts Ford had with its vendors, the price actually paid or payable was subject to change. Accordingly, the Court holds that Ford violated 19 U.S.C. § 1592.

## 2. Ford Violated 19 U.S.C. § 1485

The Court finds that the testimony and documents submitted at trial established that Ford violated the "at once" requirement of 19 U.S.C. § 1485. As the court noted in Hitachi, an importer may escape liability for failing to meet the requirements of 19 U.S.C. § 1485 by implementing one of two statutory mechanisms available. See Hitachi, 21 CIT at 389, 964 F. Supp. at 361-62. An importer "may arrange to hold open liquidation under 19 U.S.C. § 1504(b)," or "deposit estimated duties" pursuant to 19 U.S.C. § 1505. Id.

Under 19 U.S.C. § 1485, lump sum payments must be reported to Customs at once unless other arrangements have been made.

Ford contends that, in order to prove that it acted with reasonable care, Ford need only show that it met its "obligation to notify Customs after entry if it received information that entered prices had changed." Def.'s Post-Trial Br. at 19. Ford also argues that the Reconciliation Agreement placed Customs on notice, thereby satisfied the requirements of advance timely notice set forth in Hitachi. See id. Ford maintains that it had created procedures to tender duties after post-entry payments were made. See id. Lastly, Ford asserts that it consistently filed reconciliations with Customs and that its "program was more proactive than the type of post entry notice to Customs than the Hitachi court contemplated." Id. at 20.

The evidence established that the Reconciliation Agreement constitutes an arrangement between Customs and Ford, which modified Ford's duty under 19 U.S.C. § 1485. Pursuant to the arrangement, Ford was allowed to report lump sum payments made after entry in an annual reconciliation report to Customs. See Pl.'s Ex. 55. Ford proposed the Reconciliation Agreement to capture and report to Customs lump sum payments made after vehicles and vehicle components had been entered. See id. Under the plain language of the Reconciliation Agreement, Ford was required to submit such

reports within 60 days after the close of each model year, July 30. See Pl.'s Ex. 55 (stating that "[a]n annual reconciliation report will be prepared for each import program and filed with the Detroit customs"). Mr. Kruzich, the Ford employee who proposed the 60-day time frame, chose the time frame because he "thought it was reasonable at the time." Joint Ex. 2 at 114.

Ford did not rebut with credible evidence the specific language of the agreement which set the 60-day time-frame as a fixed deadline. Ford presented several witnesses that indicated that they believed the 60-day time-frame was a target date rather than a fixed deadline. See Joint Ex. 2 at 114-15; TT at 541. Based on the witnesses demeanor and inability to independently recollect events and facts, the Court finds their testimony incredible. Moreover, the testimony of these witnesses is directly controverted by the plain language of the Reconciliation Agreement, which states that reconciliation reports were to be filed "within 60 days after the close of each model year (July 30) . . . ." Pl.'s Ex. 55. Furthermore, there was no evidence presented by Ford of any other agreement modifying the Reconciliation Agreement. Customs' response to Ford's proposal for the Reconciliation Agreement did not modify the proposed time-frame. See Pl.'s Ex. 55. The testimony and documentary evidence established that the 60-day time frame was a deadline and not a "target" date. The

evidence demonstrated that the Reconciliation Agreement absolved Ford from liability of reporting changes in value "at once", if Ford reported such changes before the 60-day deadline.  The agreement, however, did not absolve Ford  from liability for submissions made after the 60-day deadline had lapsed.

Customs established that Ford failed to meet the requirements of 19 U.S.C. § 1485 or the Reconciliation Agreement.  Except for one of the duty tenders at issue, Ford failed to submit its reconciliation reports to Customs within the 60-day deadline.  See e.g. Pl's. Ex. 12, 14, 15, 17, 19, 20, 29, 30, 33, 35.  Ford's failure to timely file the reconciliation reports was in direct contravention to the plain text of the Reconciliation Agreement. In failing to meet the deadline, Ford waived its immunity from liability for violating the "at once" provision of 19 U.S.C. § 1485.  Moreover, the evidence established that Ford failed to exercise reasonable care to comply with the terms of the Reconciliation Agreement or 19 U.S.C. § 1485.

Although Ford may have escaped liability if it had submitted its reconciliation reports within the 60-day deadline, Ford failed to comply with the explicit terms of the agreement and consistently filed reconciliation reports well after the 60-day deadline.  See e.g., Pl.'s Ex. 12, 14, 15, 17, 19, 20, 29, 30, 33, 35.  The reconciliation process "could take anywhere from a few months to

six months to eight months." TT at 391. Ford, however, only began the reconciliation process at the end of the model year. See TT at 387-88. The testimony of Ms. Monro, the Ford employee responsible for creating the bulk of the reconciliation reports at issue, see TT at 381, established that Ford knew or should have known that the reconciliation process could not be completed within the 60 days after the model year. Ford failed to present evidence that it notified Customs that its reconciliation reports would not be submitted before the 60-day deadline lapsed. Ford also did not seek permission from Customs to extend the 60-day deadline. See TT at 344; Joint Ex. 2 at 117. Furthermore, in compiling the reconciliation reports, Ford did not contemplate reporting any expenses paid after the model year closed until the following year's reconciliation report. See TT at 386, 402-03, 435-36. Ford's lack of reasonable care is further illustrated by its inability to accurately capture all lump sum payments in the untimely reconciliation reports. On several occasions Ford advised Customs that it had failed to capture ceratin lump sum payments in the reconciliation reports it had already submitted. See e.g., Pl.s' Ex. 19 & 34. Ford also submitted letters to Customs which it labeled "prior disclosures" to advise Customs that it had failed to report lump sum payments made after entry. See e.g., Pl.s' Ex. 33 & 34. Ford's failure to begin the reconciliation process before the model year ended, even though it knew that it was a lengthy

process, and its failure to notify Customs that the reconciliation reports would be submitted after the deadline demonstrated Ford's lack of reasonable care.

The evidence presented at trial established that Ford had an agreement with Customs to submit reconciliation reports within 60 days after the model year closed. Ford argues that it understood the deadline of the Reconciliation Agreement to be a target date. See Def.'s Post-Trial Br. at 20-21. Ford, however, failed to present persuasive evidence to support its claim. Ford violated the Reconciliation Agreement and filed its reconciliation reports after the Reconciliation Agreement deadline. In some instances Ford disclosed such information a year or more after the close of the model year. See e.g., 15, 20, 32, 36, 38. Ford failed to produce any evidence that a reasonable person acting with reasonable care would have understood the agreement to mean anything other than imposing a 60-day deadline. Moreover, Ford did not present evidence that it took reasonable measures to meet the deadline. Based on the testimony and documentary evidence, the Court concludes that Ford violated the terms of the Reconciliation Agreement and the "at once" requirement 19 U.S.C. § 1485 because it failed to exercise reasonable care.

C.    **Ford Failed to Make Prior Disclosures of its Violations**

The maximum penalty an importer may be assessed is significantly reduced if the importer discloses facts and circumstance relating to a violation.  See 19 U.S.C. § 1592(c)(4). To make a prior disclosure, the person concerned must disclose the circumstances of a violation before, or without knowledge of, the commencement of a formal investigation and make a tender of any actual loss of duties.[6]  See id.; 19 C.F.R. § 162.74(a) (1992).  A formal investigation is considered to be commenced on the earliest of the following: (1) the date recorded in writing in the investigatory record as the date the investigating agent believed the possibility of a violation existed; (2) the date an investigating agent inquired, in writing or in person, about the disclosed violation; or (3) the date an investigating agent requested specific books and records relating to the disclosed violation.  See 19 C.F.R. § 162.74(d)(4).  Furthermore, if before the claimed prior disclosure a person is informed of "the type of circumstances of the disclosed violation," then she is "presumed to have had knowledge of the commencement of a formal investigation."

---

[6]     A violator "discloses the circumstances of a violation" by providing Customs with a written statement which: (1) identifies the class or kind of merchandise involved; (2) identifies the entry included in the disclosure; (3) specifies the material omission or false statement made at entry; and (4) sets forth the true and accurate information or data which should have been provided in the original entry documents.  See 19 C.F.R. § 162.71(e).

19 C.F.R. § 162.74(f). This presumption, however, may be defeated with evidence that the person did not know an investigation had commenced with respect to the disclosed information. See id.

Ford contends that the maximum penalty that may be assessed is limited because Ford's disclosures and duty tenders relating to lump sum payments constituted valid prior disclosures. See Def.'s Post-Trial Br. at 23-26. Ford asserts that the documents describing Customs' Operation Hat Trick limit the scope of the investigation to assists and indirect payments. See id. at 24. Customs' regulations define the terms "assists" and "indirect payments" and, therefore, the terms used to describe the investigation are precise and unambiguous. See id. Ford maintains that, at the June 1991 Meeting, Mr. Gibson asked for a definition of the term "indirect payments" and he was simply presented with two summonses from Mr. Turner. See id. Consequently, Ford argues that it "relied on Customs published regulation to define the terms" and, therefore, the scope of Customs' investigation. Id. at 25. Ford further contends that the summonses did not expand the scope of the investigation beyond the description set forth in Customs' May 23, 1991, notification letter. See id. Ford also argues that the submission and tenders it filed between 1991 through 1993 were outside the scope of the investigation. Ford asserts that the payments Ford made directly to its vendors did not

constitute either assists or indirect payments and are consequently outside the scope of the investigation.

The evidence established, however, that the assists and indirect payments Ford made in connection with the entries at issue were within the scope of Customs' Operation Hat Trick investigation. See TT at 37-39, 47-48, 283-84, 511-12; Pl.'s Ex. 70 & 71. Operation Hat Trick was initiated by Mr. Turner, based on personal observations, and information from import specialists indicating that Ford and other car manufacturers were not declaring the full value, or price paid or to be paid, for merchandise entered into the United States. See TT at 37-38, 283. The evidence established that Operation Hat Trick "included all the components surrounding value, material omissions, undervaluations, payments that may not have been reflected on the invoice that was submitted with the entry summary . . . ." TT at 283; see also TT 37-38. Ford requested the June 1991 Meeting because neither Mr. Gibson nor Mr. Cohen knew what Customs meant by an indirect payment in its May 23, 1991, notification letter. See TT at 496-97; see also TT at 45-46. Ford did not "make indirect payments in terms of the general definition that [Ford] knew; that is, a payment to A, A makes a payment to B for the benefit of C. That is what we thought was an indirect payment, and Ford did not do that." TT at 498; see also TT at 508.

The testimony and documentary evidence demonstrated that Customs explained to Ford the scope of its investigation. Customs notified Ford that "the investigation was going to look at the full scope of their imports of automobiles and automobile parts; that [Customs] would be looking programatically one program at a time." TT at 47; see also TT at 51-52; Pl.'s Ex. 71. Ford was advised at the June 1991 Meeting that Customs' investigation included the entire scope of Ford's importation of certain vehicles and vehicle components. See TT at 286-88; Pl.'s Ex. 71. Ford knew or should have known that the term "indirect payment," as used by Customs in its notification to Ford of the investigation, included all payments that impacted the final price paid for the merchandise in question. See TT at 511-12. Based on the evidence, the Court concludes that the payments Ford made directly to its vendors between 1987 through 1992 constitute either assists or indirect payments and, therefore, were within the scope of the Operation Hat Trick investigation.

Moreover, the evidence established that Customs began its investigation of Ford on or before May 23, 1991. See Pl.'s Ex. 70. Ford was notified of Customs' investigation by letter dated May 23, 1991. See Pl.'s Ex. 5. Ford's request of a meeting with Customs to discuss the notification letter illustrates Ford's knowledge of Customs' investigation. See 19 C.F.R. § 162.74(f). Accordingly,

to make a valid prior disclosure, Ford would have had to disclose the circumstances of its violations and make tenders of any actual loss of duties before May 23, 1991, the date Customs notified Ford, in writing, of the nature of its investigation. See 19 C.F.R. § 162.74(a) & (d)(4). Ford failed to present any evidence that it made such disclosures prior to this date. Rather, Ford's letters advising Customs of its violations all came after the May 23, 1991, notification letter. See e.g., Pl.'s 8, 12, 14, 15, 16, 17, 19, 20, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 42, 43. The Court concludes that Ford failed to meet its burden of establishing that it lacked knowledge of Customs' investigation prior to or at the time Ford made its disclosures. See 19 U.S.C. § 1592(c)(4). The evidence established that Ford knew of Customs' investigation and that the scope of such investigation covered the entries for which Ford tendered undeclared duties after the investigation was commenced.

**D.   Ford's Payments Relating to the Festiva**

In 1988, Ford and Mazda Motor Corporation ("Mazda"), a Japanese corporation, executed a Passenger Vehicle Program Agreement ("Festiva Agreement") pursuant to which Ford agreed to purchase Festiva vehicles from Mazda for importation to the United States. See Pl.'s Ex. 58. Ford argues that the Festiva Agreement established a minimum annual volume commitment of 85,000 and that

Ford's failure to purchase such an amount of Festivas would result in a shortfall penalty. See Def.'s Post-Trial Br. at 28-29. Ford asserts that the "shortfall penalty provisions were distinct in both form and substance from any other price adjustment." Id. at 28. Ford argues that the case at bar is indistinguishable from Chrysler Corp. v. United States, 17 CIT 1049 (1993), where production shortfall payments were held to be non-dutiable. See Def.'s Post-Trial Br. at 29. Ford maintains that the shortfall payments were booked to different accounts, which were different from the purchased vehicles accounts and, therefore, not part of the price for imported vehicles. See id. Additionally, the shortfall payments were calculated after the close of the period specified in the agreement and were made in lump sum. See id. Similar to the agreement at issue in Chrysler, under the Festiva Agreement, Ford would have had to pay a substantial penalty if it did not purchase any vehicles. See id. Ford argues that because no duties were due on Ford's shortfall payments, Ford is entitled to recoup the duty tendered for lump sum payments made pursuant to the Festiva Agreement. See id. at 31. Ford argues that it should receive the amount of duties it paid on such lump sum payments as a credit to offset any potential penalties that may be assessed. See id.

Pursuant to 19 C.F.R. § 152.103(a)(1) (1992), the method of deriving the price actually paid or payable will not be considered in determining the transaction value.  Rather, the regulation instructs that the price actually paid or payable may be "the result of discounts, increases, or negotiations, or may be arrived at by the application of a formula."  Accordingly, a payment that represents something other than the per se value of the good may be properly included in the transaction value.  See Chrysler, 17 CIT at 1054 (citation omitted).  The Court must determine whether the payment by the buyer to the seller was in exchange for merchandise sold for export.  See id.  If the payment was not in exchange for merchandise, then such payment constitutes a penalty which may not be included in transaction value.  See id. at 1054-55.

In Chrysler, the agreement did not contain a formula for changing the base price depending upon the number of vehicles purchased.  See id.  Rather, the court in Chrysler held that the terms of the agreement at issue obligated the importer to pay a penalty for each engine that it did not purchase.  See id.  Such penalty payments were not part of the transaction value because nothing was received in exchange for the penalty payments.  See id. The court, in VWP of Am., Inc. v. United States, 25 CIT 1056, 163 F. Supp. 2d 645 (2001), noted that "[c]onceptually, the economic 'value' of merchandise in its state as imported would include all

matters which accrue in advance and are incidental to placing it into the international stream of commerce." Id. at 1063, 163 F. Supp. 2d at 653. The court observed that the shortfall payments at issue in Chrysler were non-dutiable because they were triggered by non-performance on a contract, rather than importation. See id.

The Court finds that contrary to Ford's contention, the Festiva Agreement is not similar to the agreement in Chrysler and therefore, the lump sum payments made by Ford pursuant to the Festiva Agreement are dutiable. The Festiva Agreement established various mechanisms for adjusting the initial purchase price of Festivas. Depending on the adjustments, Ford was either obligated to make additional payments to, or be entitled to receive payments from, Mazda. Under the agreement, Ford was either obligated to make payments pursuant to market basket criteria provisions (sections 3.3 and 3.4 of the Festiva Agreement) or the annual volume commitment and volume price adjustment provisions (sections 2.1 and 2.3 of the Festiva Agreement, respectively). See Pl.'s Ex. 58. Under section 3.3, Ford agreed to purchase Festivas for a specified base price per vehicle, according to an initial pricing schedule described in the agreement. See id. In an effort to keep the purchase price of the imported vehicles competitive within the United States and Canadian markets, however, the parties agreed to adjust the initial purchase price on a semi-annual basis pursuant

to the terms of section 3.4. See id. Section 3.4 incorporates a formula that compares the imported automobiles to similar automobiles competing in the same market to derive price adjustments for the imported automobiles. See id. Those price adjustments would be reconciled on a semi-annual basis, and any difference between the preliminary purchase price would be paid in a lump sum. See id.

Pursuant to section 2.1 of the Festiva Agreement, Ford was obligated to purchase 85,000 Festivas in a model year. See Pl.'s Ex. 58. Section 2.3 specifies formulas for determining an "Adjusted Purchase Price" in the event that Ford's purchase of Festivas exceeded or fell short of the annual volume commitment. See id. Under Section 2.3A, if the number of orders for Festivas was between 50 and 90 percent of 85,000 vehicles, then the purchase price for each vehicle would increase. See id. If the number of orders was less than 50 percent of 85,000 vehicles, then the parties were obligated to engage in good faith discussions and either (1) the purchase price would increase, or (2) the parties would renegotiate the terms of the contract to the extent possible, or terminate the agreement. See id. Finally, if Ford's bought more than 93,500 vehicles, then the purchase price per vehicle would decrease. See id.

The evidence demonstrated that, based on the number of vehicles purchased, the purchase price for each vehicle changed according to the formulas set forth in the Festiva Agreement. See Pl.'s Ex. 58; see also TT at 77-79. In contrast to the penalty payments in Chrysler, Ford's payments under the Festiva Agreement were not triggered by or based on a purchase commitment or quota. See id. Rather, the purchase price or transaction value of each vehicle was adjusted depending on changing market conditions. The Court notes that the Festiva Agreement's cancellation clause provided for the recovery of fixed costs by Mazda if Ford failed to perform. See Pl.'s Ex. 58. In contrast, the agreement in Chrysler required the importer to pay a penalty for each engine it did not purchase so that the producer could recoup fixed costs expended. See Chrysler, 25 CIT at 1054-55. Consequently, the lump sum payments Ford made in connection with the Festiva did not constitute a penalty. Rather, these payments were related to the price actually paid or payable and, therefore, were dutiable. Consequently, Ford's request for a credit for overpaid duties is not warranted because Ford owed Customs the duties it tendered.

### E.    Customs Failed to Prove $68,178 For Duties Remains Unpaid

Ford asserts that Customs' demand for duties in the amount of $68,178 with respect to undeclared development costs for the Yamaha 3.2 liter SHO engines should be dismissed. See Def.'s Post-Trial

Br. at 30. Ford contends that Customs did not satisfy its burden of proof because it presented "no evidence to explain to what the amount alleged in the Complaint relates, how the amount was calculated, or evidence showing that Customs made a demand for payment prior to this action." Id. Alternatively, Ford argues that Customs' demand for $68,178 was not the subject of any pre-penalty or penalty notice. See id. Therefore, Ford was prevented from exhausting its administrative remedies. See id. Ford also asserts that Customs did not follow its own administrative procedures, as illustrated by Customs failure to make a proper demand pursuant to 19 C.F.R. § 162.79b. See id. Consequently, Ford argues that the Court lacks jurisdiction over this claim. See id.

Customs asserts, however, that Ford failed to produce evidence establishing that Ford's waiver of the statute of limitations related to Yamaha SHO engines did not encompass development costs for non-imported prototype engines. See Customs' Post-Trial Br. at 31. Customs asserts that the statute of limitations is an affirmative defense to an action seeking unpaid duties and penalties and, therefore, may be waived. See id. Moreover, Customs argues that Ford bears the burden of proof concerning the application of the statute of limitations defense because it raised the affirmative defense. See id. Ford, however, did not prove that the general waiver included the duty claim for $68,178. In

addition, Customs maintains that 19 U.S.C. § 1592 does not require that the duty claim be addressed in an administrative proceeding. See id. at n.21. Accordingly, Customs argues that it is entitled to $68,178 for unpaid duties related to development costs for the Yamaha 3.2 liter SHO engine.

The Court agrees with Ford that Customs failed to present evidence to satisfy its burden of proof with respect to its demand for $68,178 for unpaid duties. Pursuant to 19 U.S.C. § 1592(d), Customs, may collect any lawful duties owed resulting from a 19 U.S.C. § 1592(a) violation notwithstanding 19 U.S.C. § 1514 (finality of liquidations) whether or not a monetary penalty is assessed. See 19 U.S.C. § 1592(d). In the present matter, however, Customs failed to present any evidence at trial to support its claim that Ford deprived Customs of $68,178 in unpaid duties and fees related to developmental costs for the 3.2 liter SHO engines. The only evidence Customs presented was ROI #27, which is a penalty case referral to the district director. See Pl.'s Ex. 59. As aforementioned, the Court does not place great weight in the veracity of this document because it was created in contemplation of penalty proceedings against Ford. Additionally, Customs failed to introduce into evidence the pre-penalty or penalty notices.

Customs failed to present any corroborating evidence suggesting that Ford failed to tender correct duties. Accordingly, the only evidence the Court has before it to evaluate the validity of the claim is the complaint itself. Without supporting evidence moved and admitted into evidence during trial, there is insufficient evidence demonstrating that Customs was deprived of duties. Accordingly, the Court concludes that Customs has failed to carry its burden of proof and, therefore, Customs request for $68,178 for unpaid duties and fees is denied.

### F.    Assessment of Penalties

For negligent violations of 19 U.S.C. § 1592(a), the maximum penalty is the lesser of the domestic value of the merchandise or twice the loss of duties. See 19 U.S.C. § 1592(c)(3); 19 C.F.R. § 162.73(a)(3). The plain language of the statute only sets maximum penalties and does not establish minimum penalties. See 19 U.S.C. § 1592(c)(3). Moreover, the statute does not require the court to begin with the maximum possible penalty and reduce that amount in light of mitigating factors. See United States v. Modes, Inc., 17 CIT 627, 635, 826 F. Supp. 504, 512 (1993). The Court has discretion to impose a penalty within the maximum established by the statute. A number of factors, however, may be considered in assessing a penalty. See id. at 636, 826 F. Supp. at 513; United States v. Complex Mach. Works Co., 23 CIT 942, 949-50, 83 F. Supp.

2d 1307, 1315 (1999).  These factors are:

1.   The defendant's good faith effort to comply with the statute.
2.   The defendant's degree of culpability.
3.   The defendant's history of previous violations.
4.   The nature of the public interest in ensuring compliance with the regulations involved.
5.   The nature and circumstances of the violation at issue.
6.   The gravity of the violation.
7.   The defendant's ability to pay.
8.   The appropriateness of the size of the penalty to the defendant's business and the effect of a penalty on the defendant's ability to continue doing business.
9.   That the penalty not otherwise be shocking to the conscience of the Court.
10.  The economic benefit gained by the defendant through the violation.
11.  The degree of harm to the public.
12.  The value of vindicating the agency authority.
13.  Whether the party sought to be protected by the statute had been adequately compensated for the harm.
14.  And such other matters as justice may require.

See Complex Mach., 23 CIT at 949-50, 83 F. Supp. 2d 1315 (citations omitted).  The first ten factors relate to deterring future violations, which was Congress' primary focus when it enacted 19 U.S.C. § 1592.  See id. at 950, 83 F. Supp. 2d at 1316. Consequently, in determining the size of the penalty, these ten factors are accorded greater weight.  See id.

Pursuant 19 U.S.C. § 1592(c)(3), the maximum penalty that can be assessed against Ford for negligence is $17,151,923.60, twice the loss of revenue, $8,575,961.80, to the United States established by Customs.  In Count II of its complaint, Customs claims that the loss of revenue to the United States was

$8,644,139.80, of which $68,178 remains unpaid. <u>See</u> Compl. Based on its alleged loss of revenue, Customs seeks a penalty of $17,288,279. <u>See</u> <u>id.</u> The Court, however, concludes that Customs failed to meets its burden and establish that Ford owes $68,178 for unpaid duties. Accordingly, the Court finds that the actual loss of revenue to the United States was $8,575,961.80.

Ford argues that any penalty assessed should be mitigated because there is significant evidence demonstrating Ford's consistent efforts to comply with its statutory obligations. <u>See</u> Def.'s Post-Trial Br. at 32. Ford asserts that it made consistent efforts to fully and properly account for its transactions. <u>See</u> <u>id.</u> Ford maintains that Customs "was fully aware of [Ford's] reconciliations and never told Ford of any deficiency in its filings." <u>Id.</u> Finally, Ford asserts that the interests of justice require the Court to assess a relatively lenient penalty because Ford did not gain anything from its failure to abide by the deadline set forth in the Reconciliation Agreement. <u>See</u> <u>id.</u> at 33.

After carefully considering the mitigating factors set forth in <u>Complex Machine</u> and the evidence presented at trial, the Court has determined that the penalty assessed must be a substantial one. The evidence before the Court established, by a preponderance, Ford's failure to comply with 19 U.S.C. §§ 1481, 1484, 1485 and 1592. The Court takes into account, <u>inter alia</u>, the degree of harm

to Customs, the duration of Ford's violations, and whether Ford made a good faith effort to fulfill its statutory obligations. There was overwhelming evidence presented that Ford failed to declare the correct transaction value at entry for more than $350 million of merchandise entered between 1987 through 1992. See Pl.'s Ex. 8, 12, 14, 15, 16, 17, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 42, 43, 57. In an effort to comply with 19 U.S.C. § 1485, the evidence showed that Ford failed to make a good faith effort to meet its obligations pursuant to the Reconciliation Agreement. The majority of reconciliation reports submitted in connection with the entries at issue were well after the 60-day deadline imposed by the Reconciliation Agreement. Furthermore, the evidence demonstrated that Ford on several occasions had to file additional reconciliation reports because it had failed to adequately capture certain lump sum payments in its previous submissions. Customs established by a preponderance of the evidence that Ford failed to declare assists and lump sum payments made between 1987 through 1992 because of Ford's failure to exercise reasonable care. Ford's failure to properly declare such payments over the course of five years further illustrates Ford's lack of good effort to correct its violations.

The evidence also established that Ford failed to exercise reasonable care in carrying out its own customs compliance measure. The manual instructed Ford employees to place a "provisional" disclaimer on invoices when the value of the merchandise is not completely or correctly shown. See Joint Ex. 2. The evidence established that Ford employees did not follow the compliance manual. The transaction values for the entries at issue were not known at the time of entry because Ford had supply agreements with its vendors subjecting the prices of the merchandise to further adjustments. See Pretrial Order, Schedule C ¶ 1. Ford, however, did not present any evidence that a "provisional" disclaimer was placed on any of the invoices relating to the merchandise at issue. The Court concludes that Ford's inexplicable failure to follow its own compliance measures and its statutory obligations was the result of Ford's negligence.

The Court, after weighing the evidence and the various mitigating factors, concludes that Ford's penalty does not warrant mitigation. The severity of Ford's culpability and the resulting violation of its statutory obligations were substantial. The significant public interest in the enforcement of Customs' regulations also weigh in favor of the imposition of a heavy penalty. See Complex Mach., 23 CIT at 952, 83 F. Supp. 2d at 1317. Here, the evidence established by a preponderance that Ford's

negligent conduct led to its failure to meet its statutorily mandated obligations. Consequently, the Court assesses the statutory maximum penalty for negligence pursuant to 19 U.S.C. § 1592(c)(3). Ford is assessed a penalty of $17,151,923.60.


## CONCLUSION

Ford negligently violated 19 U.S.C. §§ 1481, 1484, 1485 and 1592 by failing to advise Customs that the transaction values in the entry documents were not final. Ford violated 19 U.S.C. § 1485 by failing to adhere to the requirements of the Reconciliation Agreement of reporting lump sum payments. Pursuant to 19 U.S.C. § 1592, the Court grants judgment for plaintiff and assess a civil penalty against defendant in the amount of $17,151,923.60, plus interest from the date of judgment. Plaintiff's request for $68,178 for unpaid duties is denied. Defendant's counterclaim for a credit for duty tenders made with respect to lump sum payments for the Festiva is also dismissed. Judgment shall be entered accordingly.


 /s/ Nicholas Tsoucalas  
 NICHOLAS TSOUCALAS  
 SENIOR JUDGE


Dated: July 21, 2005  
　　　New York, New York