# United States Court of Appeals for the Federal Circuit

05-1584

UNITED STATES,

Plaintiff-Appellee,

v.

FORD MOTOR COMPANY,

Defendant-Appellant.

David A. Levitt,Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for plaintiff-appellee.  With him on the brief were Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, and Patricia M. McCarthy, Assistant Director.  Of counsel on the brief were Kathleen Bucholtz and Katherine F. Kramarich, Attorneys, Office of Associate Chief Counsel, United States Customs and Border Protection, of Chicago, Illinois.

Charles J. Cooper, Cooper & Kirk, PLLC, of Washington, DC, argued for defendant-appellant.  With him on the brief were Vincent J. Colatriano, David H. Thompson, and Nicole Jo Moss.  Of counsel on the brief were Robert B. Silverman, David M. Murphy, and Frances P. Hadfield, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt, LLP, New York, New York; and Paulsen K. Vandevert, Ford Motor Company, of  Deaborn, Michigan.

Appealed from:  United States Court of International Trade

Senior Judge Nicholas Tsoucalas

# United States Court of Appeals for the Federal Circuit

05-1584

UNITED STATES,

Plaintiff-Appellee,

v.

FORD MOTOR COMPANY,

Defendant-Appellant.

_____

DECIDED: August 30, 2006

_____

Before NEWMAN, RADER, and GAJARSA, <u>Circuit Judges</u>.

GAJARSA, <u>Circuit Judge</u>.

Ford Motor Company appeals from a decision of the United States Court of International Trade holding Ford liable for negligent misrepresentation of the value of import entries and imposing a penalty of $17,151,923.60. <u>United States v. Ford Motor Co.</u>, 395 F. Supp. 2d 1190 (Ct. Int'l Trade 2005) ("<u>Negligence Decision</u>"). Ford timely filed a notice of appeal on September 16, 2005. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5). For the reasons stated herein, we affirm in part, reverse in part, and remand for further proceedings in accordance with this opinion.

BACKGROUND

Ford is a major importer of automobiles and automobile parts from all over the world. This case deals with Ford's importation practices, and specifically with its methods for handling the declaration of value for imported goods the price of which is subject to change after importation.

A. Assists and Direct Payments

Two concepts lie at the heart of the case. The first, "assist," is defined by statute as "materials, components, parts, and similar items incorporated in the imported merchandise" that is provided "free of charge or at a reduced cost, by the buyer of imported merchandise for use in connection with the production or sale for export to the United States of the imported merchandise." 19 U.S.C. § 1401a(h)(1). An "assist" might consist of, for example, design or engineering work provided overseas by the buyer/importer to the seller that is not factored into the invoice price. The value of the assists is subject to import duties pursuant to 19 U.S.C. § 1401a(b)(1)(C).

The trial court found, and Ford does not dispute, that assists relating to a particular model year vehicle or component typically occur long before entry of the actual merchandise. Negligence Decision, 395 F. Supp. 2d at 1197. During the years at issue, Ford maintained an internal program "whereby it gathered information about assists at the time of importation and paid all duties related to such assists on the first entry" of the related merchandise. Id. Despite this program, it appears that Ford failed to report significant numbers of assists until years after the related merchandise entered the United States. In 1992, Ford disclosed to what was then the United States Customs

05-1584                                    2

Service ("Customs")[1] the existence of previously undisclosed assists relating to numerous entries in the years 1987-1991. Id. at 1197-200.

The second concept is "direct" or "lump-sum" payments, which are payments of money by the importer to the seller separate from—and usually subsequent to—the payment of the original price but that relate directly to the purchase price of the imported item. A typical lump-sum payment might represent amounts owed to the seller under a variable-pricing clause, pursuant to which the final cost of the item varies with some extrinsic index or factor, and requires a gross-up payment after the fact. Lump-sum payments, like assists, are dutiable under the import laws as part of the "the total payment . . . for imported merchandise" for purposes of 19 U.S.C. § 1401a(b)(4).

Ford's supply agreements with many of its overseas vendors "contained post-importation price adjustments, which typically provided a per vehicle or vehicle component base price subject to possible modifications." Id. at 1196. Ford knew that the prices of imported merchandise, although "fairly firm" upon importation, could change after importation pursuant to the supply agreements. During the years at issue, Ford's internal compliance procedures stated that upon entry "[t]he invoice must be priced so that the true value can be ascertained. In the event that the value is not completely and correctly shown, a 'provisional' disclaimer is stated on the invoice, thereby advising [C]ustoms" of the possibility that the entry price was non-final. Id. at 1203. The record indicates, however, that despite this policy Ford invoices in the disputed period did not disclose the provisional nature of invoice prices.

---

[1] The United States Customs Service is now part of the Department of Homeland Security, and is known as the Bureau of Customs and Border Protection.

In 1988, Ford and Customs entered into an agreement that altered Ford's reporting obligations relating to direct payments (the "Reconciliation Agreement"). The Reconciliation Agreement permitted Ford to report all lump-sum post-importation payments relating to a particular model year in a single disclosure filed at the end of the model year in question. The exact scope of the Reconciliation Agreement, and the timing of disclosures made pursuant to it, are the subject of dispute between the parties, and are discussed in detail below.

### B. Customs' Investigation and Complaint

Customs initiated "Operation Hat Trick" in the early 1990s "to identify undeclared assists and indirect payments" made by the Big Three automakers, to "determine the level of culpability of parties responsible for the failure to declare the assists/payments," and to "refer cases for criminal and civil action as appropriate." Negligence Decision, 395 F. Supp. 2d at 1193. On May 23, 1991, Customs notified Ford by letter that a formal investigation was underway "concerning the proper declaration of assists and indirect payments in imports of vehicles and vehicle component assemblies." Id. at 1194. On June 7, 1991, at Ford's request, the parties met to clarify the meaning of "indirect payments" as it was used in the notice of investigation. Id. The substance of the discussions held at the meeting are the subject of dispute in this appeal. The trial court concluded that, following the meeting, "Ford knew or should have known that the term 'indirect payment' . . . included all payments that impacted the final price paid by Ford for the merchandise in question," including payments made directly by Ford to foreign suppliers. Id. at 1195. The trial court also found as fact that "Ford was advised by Customs that the investigation would encompass entries made between 1987

through the 1991 model year," but would not include entries for model years 1992 or later. Id. at 1196. Both of these findings are discussed in detail below.

The government filed its complaint in the Court of International Trade on January 29, 2002, charging Ford with violation of 19 U.S.C. § 1592, which provides that "no person, by fraud, gross negligence, or negligence," may enter any merchandise into the commerce of the United States by means of any document, information, statement, act, or omission which is "material and false." 19 U.S.C. § 1592(a)(1). The government's allegations center on alleged omissions from Ford's entry documents under 19 U.S.C. § 1484, which requires importers to file with Customs information about entered merchandise, including "the declared value, classification and rate of duty applicable to the merchandise, and . . . such other information as is necessary to enable the Customs Service to . . . properly assess duties on the merchandise." 19 U.S.C. § 1484(a)(1)(B). The government alleges that Ford's entry documents were materially false to the extent that they assigned to merchandise a concrete value that Ford knew was likely to change pursuant to variable-pricing provisions in the sale contracts. The government further alleges that, regardless of whether Ford had an affirmative duty to disclose the provisional nature of its pricing, it had an affirmative obligation to inform Customs "at once" when it became aware that the declared values were incorrect, but failed to do so. 19 U.S.C. § 1485(a) (stating that every importer making an entry under § 1484 shall make "a declaration under oath," stating, inter alia, "[t]hat the prices set forth in the invoice are true," that "all other statements in the invoice or other documents filed with the entry, or in the entry itself, are true and correct," and that "he will produce at once to the appropriate customs officer any invoice, paper, letter, document, or information

received showing that any such prices or statements are not true or correct")  Ford denied the allegations and counterclaimed for a refund of duties it allegedly overpaid.

The Court of International Trade conducted a bench trial, after which it found that Ford was guilty of negligent (but not grossly negligent) violation of both § 1484 and § 1485 and assessed a penalty of more than $17 million—the maximum penalty permitted by statute in the circumstances.  In reaching that decision, the trial court concluded that § 1484 included an affirmative requirement that entry prices indicate the existence of any provisional pricing arrangements that might render the invoice price non-final; that Ford violated that requirement; and that because Ford had knowledge of the requirement, it could be held liable for the violation consistent with due process. Negligence Decision, 395 F. Supp. 2d at 1208-13.  The Court of International Trade further held that Ford failed to satisfy the Reconciliation Agreement's requirements for reporting direct payments, thereby violating that agreement and, by extension, § 1485. Id. at 1213-15.  It also dismissed Ford's counterclaim for a refund of overpaid duties.  Id. at 1222.  Finally, the court assessed the maximum penalty permitted by the statute in a case involving negligence: double the amount of revenue lost to the government, for a total of $17,151,923.60.  Id. at 1221-22; see also 19 U.S.C. § 1592(c)(3) (setting forth the maximum civil penalty for negligent violation of § 1592).  In so doing, the court considered various mitigating factors proposed by Ford but concluded that because Ford "failed to make a good faith effort to meet its obligations," and "inexplicably" failed to follow its own compliance procedures, the penalty did not warrant mitigation. Negligence Decision, 395 F. Supp. 2d at 1221.

On appeal, Ford challenges all of the trial court's legal rulings. It argues that 19 U.S.C. § 1484 does not require importers to disclose the existence of provisional pricing, or, in the alternative, that such a requirement could not be imposed on Ford consistently with due process of law. It argues that the Reconciliation Agreement modified its obligation to disclose modified price information "at once" and that Ford complied with all the requirements in that agreement. It also claims that even if it violated §§ 1484 and 1485, the trial court erred in finding its conduct negligent for purposes of liability under § 1592. Ford further asserts that several of its submissions detailing direct payments constituted "prior disclosures" under 19 U.S.C. § 1592(c), subjecting Ford to less rigorous penalties. Finally, Ford argues that the trial court erred in its calculation of the final penalty of $17,151,923.60. Ford timely appealed to this court, and we have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5).

STANDARD OF REVIEW

We review the Court of International Trade's legal determinations without deference. United States v. Hitachi Am., Ltd., 172 F.3d 1319, 1326 (Fed. Cir. 1999) ("Hitachi II"). We review findings of fact, including findings relating to a party's intent, for clear error. Id. at 1327. Where, as here, Congress has delegated to the judiciary discretion to determine the amount of civil penalties under a statute, we review the trial court's calculation of such penalties for abuse of discretion. See, e.g., Sierra Club v. Cedar Point Oil Co., Inc., 73 F.3d 546, 573-74 (5th Cir. 1996) (reviewing district court's penalty determination under 33 U.S.C. § 1319(d) for abuse of discretion); see also Atl. States Found., Inc. v. Tyson Foods, Inc., 897 F.2d 1128, 1142 (11th Cir. 1990)

(reviewing district court's penalty determination under 33 U.S.C. § 1319(d) for abuse of discretion).

## DISCUSSION

### I.      19 U.S.C. § 1484

Section 1484 of Title 19 sets forth the procedures for the entry of imported merchandise. It requires, among other things, that importers file with the Customs Service "the declared value, classification and rate of duty applicable to the merchandise," and "such other information as is necessary to enable the Customs Service to . . . properly assess duties on the merchandise." 19 U.S.C. § 1484(a)(1)(B). The United States alleges, and the trial court found, that Ford's omission of information about assists and lump-sum direct payments from its entry documents constituted "materially false" omissions of information required by § 1484.

On appeal, Ford raises two primary arguments challenging the trial court's decision. First, it argues that the Court of International Trade misread this court's decision in Hitachi II to require disclosure of provisional pricing information. Second, it asserts that even if such a requirement existed, the 1988 Reconciliation Agreement satisfied it. The government counters that the trial court correctly applied Hitachi II and that the Reconciliation Agreement is inadequate to satisfy the § 1484 disclosure obligation, because the agreement did not "identify specific entries, if any, to which it applied," and therefore could not put Customs on notice of which entries were subject to change.

In the Hitachi litigation, the Court of International Trade ruled that § 1484 requires importers to disclose the existence of variable-pricing provisions that have "a potential

impact on the correct duty" owed on an entry. <u>United States v. Hitachi Am., Ltd.</u>, 964 F. Supp. 344, 387 (Ct. Int'l Trade 1997) ("<u>Hitachi I</u>"). It also concluded, however, that it could not penalize Hitachi for the violation "because the duty to report escalation clauses on entry documents was rendered turbid" by the publication of conflicting Customs Service guidance on the subject, which prevented importers from having notice of the requirement. <u>Id.</u> In the absence of such notice, the trial court held, an importer could not be penalized consistently with due process of law. <u>Id.</u> On appeal, this court affirmed in part, reversed in part, and remanded. <u>Hitachi II</u>, 172 F.3d at 1338.

The parties disagree about the consequence of this court's ruling for the Court of International Trade's analysis of § 1484: The government argues that our decision in <u>Hitachi II</u> "expressly acknowledged that § 1484 includes the duty to disclose price adjustment information that may be relevant to the final price." Ford submits that <u>Hitachi II</u> upheld only the trial court's due process ruling, while "stressing that section 1484 itself contains no requirement to disclose that entered prices are subject to change."

We conclude that <u>Hitachi II</u> neither affirmed nor reversed the trial court's conclusion that § 1484 requires importers to disclose the existence of variable pricing provisions relating to entries. Hitachi did not appeal that conclusion, and it was not before this court.[2] <u>See</u> Corrected Brief of Defendant/Cross Appellant Hitachi America, Ltd., <u>Hitachi II</u> (Nos. 97-1431, -1437, -1452). Ford's position is based upon language in

---

[2] In fact, it is not wholly clear that the trial court itself ever ruled on the liability question. Its opinion declares that "importers are required to disclose escalation clauses in entry documents," but makes no explicit finding either that Hitachi violated that requirement or that it did so negligently. <u>See</u> <u>Hitachi I</u>, 964 F. Supp. at 388.

Hitachi II that, read in isolation, can be construed to question the viability of the trial court's ruling:

> [I]t is not clear under section 1484 whether an [escalation] clause, which represents payments that are not definitively known at the time of importation, must be referred to at that time in order to disclose the price accurately. After all, the statute never even mentions escalation clauses or what should be done about payments that cannot be precisely known at the time of importation.

Hitachi II, 172 F.3d at 1331. That language, however, occurs in the court's discussion of the due process issue—not the liability issue, which was not before us—and was directed to the government's argument that "[t]he statute alone is sufficient to provide notice to an importer that it must declare millions of dollars of escalation payments," such that penalizing Hitachi would not violate due process. Brief of Plaintiff-Appellant United States at 43, Hitachi II (Nos. 97-1431, -1437, -1452). This court's view that a statute on its face does not provide notice of a legal obligation is not equivalent to a decision that the statute imposes no obligation.

It appears, then, that this court has never ruled on the question presented by Ford here: whether § 1484 imposes upon importers an obligation to disclose the existence of variable pricing agreements relating to entries. We conclude that the statute requires that importers disclose not only the "declared value" of entered merchandise but also "such other information as is necessary to enable the Customs Service to . . . properly assess duties on the merchandise." 19 U.S.C. § 1484(a)(1)(B). The duties owed on merchandise are in part a function of the value of that merchandise. The proper assessment of duties, therefore, depends on the proper assessment of merchandise's final entry value. A declared value that is non-final is one upon which Customs cannot "properly assess duties." The existence of a contract provision

rendering the declared value non-final, therefore, constitutes "information . . . necessary to enable" Customs to assess such duties and thus must be disclosed by the importer under § 1484.

Nevertheless, we also conclude—as we did in Hitachi II—that the Fifth Amendment's due process clause precludes penalizing Ford for violating this requirement. At the time of the entries at issue here, Ford was subject to the same statutory and regulatory scheme that faced Hitachi.[3] The government admits that, as of 2005, "Customs has not promulgated a regulation specifically addressing anticipated price changes," and although it asserts that Customs "has always required that such information be disclosed on entry records," it cites no evidence for that assertion. As was true in Hitachi, the government introduced no evidence suggesting that the duty to disclose was well known in the trade or that "actual Customs practice required disclosure." Hitachi I, 964 F. Supp. at 361. The Court of International Trade, in ruling that the due process clause did not preclude penalizing Ford, offered only the conclusory statement that "Ford has failed to establish that its duties were nebulous in the present case." Negligence Decision, 395 F. Supp. 2d at 1212. Neither the Court of International Trade nor the government has offered any substantive basis for distinguishing Ford's circumstances vis-a-vis notice from Hitachi's. To the extent that the trial court's decision rested on the notion that Ford's internal compliance program—

---

[3] Ford claims, falsely, that its entries "were made during the same timeframe as the Hitachi entries." In fact, the entries at issue in Hitachi occurred from June of 1984 through June of 1988. See Hitachi I, 964 F. Supp. at 376. The Ford entries at issue occurred from January of 1987 through December of 1992. Negligence Decision, 395 F. Supp. 2d at 1193. The government has not identified any relevant changes in the statutory or regulatory scheme from 1988 to 1992 that would require a different analysis.

which appears to have required disclosure of provisional pricing at entry—constituted evidence that Ford had actual knowledge that provisional pricing must be disclosed, we disagree. To hold otherwise—at least in the absence of other evidence of actual knowledge—would effectively require the courts to punish companies for establishing internal procedures that are more robust than the law requires. If the existence of a particular internal procedure creates an inference that the defendant knew the procedure to be required by law, companies will have a strong disincentive to adopt internal compliance procedures. In the circumstances presented here, there is no basis for creating such a rule.

Our decision in Hitachi II governs our decision here, and due process considerations preclude the imposition of penalties on Ford for violation of the duty to disclose provisional pricing under § 1484.

## II.     19 U.S.C. § 1485

The trial court ruled that Customs established, by a preponderance of the evidence, that Ford had "made assists between 1987 through 1992, which it failed to declare on its entry documents or 'at once' thereafter," and that the failure was negligent. Negligence Decision, 395 F. Supp. 2d at 1208. It also ruled that Ford failed to comply with the "at once" requirement with respect to lump-sum direct payments, or, more precisely, with the filing requirements set forth in the Reconciliation Agreement that modified its obligations under 19 U.S.C. § 1485. Id. at 1213-15. Ford challenges both of these rulings, arguing that (a) the Reconciliation Agreement applies to both assists and direct payments, and (b) it complied with the terms of the Reconciliation

Agreement, which, it claims, specified the 60-day filing period as a "target," rather than a deadline.

## A. Assists

The Court of International Trade found that Ford violated § 1485 because it "failed to 'at once' notify Customs that the entry values" relating to certain entries were inaccurate because of "tooling assists provided for certain vehicles and vehicle components," and that its failure was negligent. Id. at 1209-10.  The trial court made no express ruling that the Reconciliation Agreement did not apply to assists, but its discussion of the issue implies that conclusion.  Ford, in its initial brief, makes no argument relating directly to the question of reporting the assists under § 1485.  In its reply brief, however, it argues that the Reconciliation Agreement did apply to assists, and that its claimed compliance with the Reconciliation Agreement therefore constituted compliance with § 1485 for assists as well as for direct payments.

Arguments raised for the first time in a reply brief are not properly before this court.  See, e.g., Novosteel SA v. United States, 284 F.3d 1261, 1274 (Fed. Cir. 2002) ("a party waives arguments based on what [does not] appear[] in its brief"); see also United States v. Nealy, 232 F.3d 825, 830-31 (11th Cir. 2000) (stating the same proposition and citing numerous cases).  Ford therefore waived this argument by failing to raise it in its opening brief.  Ford's opening brief contains no argument asserting that the Reconciliation Agreement is relevant to its compliance with § 1485.  In fact, it is devoid of any argument relating to the application of § 1485 to assists, except for its contention that there was a complete failure of proof on that issue.  Even its reply brief raises the issue in cursory fashion, limiting its discussion to a single three-sentence

footnote. It is unfair to consider an argument to which the government has been given no opportunity to respond. We therefore affirm the trial court's conclusion that Ford's failure to report assists "at once" negligently violated § 1485.

## B. Direct Payments

Ford argues, and the trial court agreed, that an importer is not in violation of § 1485 if arrangements have been made with Customs to report changes in declared entry values, and that the Reconciliation Agreement constituted such an arrangement. Negligence Decision, 395 F. Supp. 2d at 1213. The trial court further concluded, however, that Ford failed to comply with the terms of the Reconciliation Agreement, thus effectively violating § 1485 itself. Id. On appeal, Ford challenges that conclusion.

The Reconciliation Agreement consists of two documents: a proposal letter sent to Customs by Ford on October 14, 1988, and a response letter from Customs dated on or about August 29, 1989. The Ford letter described a "lump sum billing proposal" (modifying a previous agreement) in which Ford offered to "track all lump sum billings throughout each model year . . . and report the dutiable expenses associated with each import program." Under the proposal, "An annual reconciliation report will be prepared for each import program and filed with the Detroit customs district within 60 days after the close of each model year (July 30) to enable us to follow up and capture all relevant model year expenses." (emphasis original). Customs' response letter stated that Customs approved the proposal "with two modifications," one of which stated that "[t]his policy applies to withheld duties on entry summaries which have been liquidated."

The Court of International Trade concluded that "[u]nder the plain language of the Reconciliation Agreement, Ford was required to submit [reports of lump sum payments]

within 60 days after the close of each model year," and that "Ford did not rebut with credible evidence the specific language of the agreement which set the 60-day time-frame as a fixed deadline." Negligence Decision, 395 F. Supp. 2d at 1213. Finding the testimony of Ford's witnesses on this point "incredible" based upon their demeanor, and further finding that with a single exception "Ford failed to submit its reconciliation reports to Customs within the 60-day deadline," the court concluded that Ford had violated § 1485. Id. at 1214.

On appeal, Ford raises three arguments. It asserts, first, that Customs' response letter implicitly eliminated the 60-day deadline in favor of a simple reasonableness standard; second, that "[n]o one from Ford or Customs ever took the position that a strict 60-day deadline applied to Ford's reconciliation obligations"; and third, that the parties' course of practice establishes that Customs never treated the 60-day period as a firm deadline.

First, Ford argues that Customs modified the agreement to eliminate the 60-day requirement. It bases this argument on the fact that its initial proposal, which included the 60-day requirement, applied to both liquidated and unliquidated entries. Customs' modification of the proposal to apply only to liquidated entries, Ford maintains, is incompatible with the existence of such a deadline, because regulations provided that Customs had up to four years to liquidate entries, and Customs at that time was running a 90-day liquidation cycle. In light of that evidence, Ford reasons, a 60-day reporting deadline is nonsensical, because very few if any entries from the relevant model year will have been liquidated within the 60 days.

We disagree. First, we note that there is no discussion of this argument in the trial court's decision, and it is not clear that it was raised at trial. If it was not raised at trial, it is waived. In addition, it is not clear that—contrary to Ford's argument—Ford's original proposal was intended to apply to both liquidated and unliquidated entries. The letter makes no explicit statement to that effect, and Customs' response—"This policy applies to withheld duties on entry summaries which have been liquidated"—does not unambiguously demonstrate that Ford's proposal would have applied to unliquidated entries. If, in fact, Ford's initial proposal was itself intended to be limited to "withheld duties on entry summaries which have been liquidated," Ford's argument about the consequence of Customs' modification loses force.

In any case, we find Ford's argument unpersuasive. Customs' letter makes no reference to the 60-day deadline, and Ford's argument of repeal-by-implication is, at best, strained. Ford's argument rests heavily on the implication that the parties knew that Customs was then running a 90-day liquidation cycle, and that they therefore understood that Customs' modification necessarily eliminated the 60-day deadline. That implication, however, conflicts with the testimony of Ford employee P.B. Kruzich, who proposed the 60-day deadline, and who testified that it was just a "target," but one that he "thought . . . was reasonable at the time." If, in fact, Ford was aware that the liquidation cycle took 90 days, and if Ford intended its proposal to apply to both liquidated and unliquidated entries, it seems unlikely that it would have proposed—and underlined for emphasis—a 60-day "target" for filing its reconciliations.

Finally, Ford's primary evidence for its position is the testimony of former Customs officer and later Ford employee Manns—testimony that the trial court found to

be "incredible" for demeanor-related reasons, a credibility determination that this court will not second-guess. Negligence Decision, 395 F. Supp. 2d at 1213-14.

Ford's second and third arguments present a more difficult question. Ford points to considerable evidence in the record suggesting that, although Ford consistently failed to file its reconciliation reports within the 60-day time-frame, "Customs never complained that any of Ford's numerous reconciliation submissions filed after the supposed 60-day deadline were 'late.'" Indeed, the trial court accepted this as fact. See id. at 1197. Nevertheless, the parties' course of performance is insufficient either to read out the 60-day deadline from the Reconciliation Agreement or to estop the government from enforcing that deadline. Course of performance evidence in most circumstances is relevant to interpretation of an instrument only if the terms of that instrument are ambiguous. See, e.g., Barron Bancshares, Inc. v. United States, 366 F.3d 1360, 1375-76 (Fed. Cir. 2004) (noting that evidence of course of dealing is parol evidence, and therefore inadmissible in the absence of contractual ambiguity); see also Restatement (Second) of Contracts § 203(b) (1981) (stating that "express terms are given greater weight than course of performance"). The Court of International Trade held that the Reconciliation Agreement was not ambiguous on this issue, and we agree. We will not address whether they may be a circumstance in which course of performance may override an unambiguous term in the contract. See Cruz-Martinez v. Dep't of Homeland Sec., 410 F.3d 1366, 1371 (Fed. Cir. 2005). We are satisfied that no such circumstance exists here.

As for estoppel, the government correctly points out that estoppel is available against government actors only in cases involving "affirmative misconduct." Rumsfeld

v. United Techs. Corp., 315 F.3d 1361, 1377 (Fed. Cir. 2003); Henry v. United States, 870 F.2d 634, 637 (Fed. Cir. 1987). Ford has not alleged any affirmative misconduct here, and indeed has not pled the elements of an equitable estoppel case at all. Therefore, there is no basis on which estoppel might prevent the government from enforcing § 1485 against Ford.

There remains the question of negligence. Statutory negligence under § 1592, unlike common-law negligence, shifts the burden of persuasion to the defendant to demonstrate lack of negligence. 19 U.S.C. § 1592(e)(4). That is, Customs has the burden merely to show that a materially false statement or omission occurred; once it has done so, the defendant must affirmatively demonstrate that it exercised reasonable care under the circumstances. The trial court concluded that Ford failed to rebut the prima facie case of negligence, although it did not explain in detail why. Negligence Decision, 395 F. Supp. 2d at 1215. Ford argues that Customs' consistent acceptance of late filings suggests the reasonableness of Ford's conduct. It also points to Customs' new "Reconciliation Prototype" program, which allows importation up to 21 months after entry to file reconciliations. Ford's reliance on Customs' pattern of accepting its late filings is simply a reiteration of its estoppel argument, rejected above. The fact that Customs today—fifteen years after the events in dispute here—may regard twenty-one months to be a reasonable reconciliation period has little bearing on what constituted reasonable care for Ford, which was subject to a requirement that it file its reconciliations within 60 days.

We therefore affirm the trial court's conclusion that Ford negligently violated § 1485.

III.    Prior Disclosures

Section 1592(c)(4) of title 19 provides a safe harbor for "prior disclosures"—disclosing import law violations "before, or without knowledge of, the commencement of a formal investigation" of the violation.  Making such a prior disclosure limits the available penalty to interest on the amount of duties, taxes, and fees of which the government was deprived by the violation.  19 U.S.C. § 1592(c)(4)(B).  A formal investigation is considered to have commenced "with regard to the disclosing party and the disclosed information on the date recorded in writing by the Customs Service as the date on which facts and circumstances were discovered or information was received which caused the Customs Service to believe that a possibility of a violation" existed.  19 U.S.C. § 1592(c)(4).  The importer has the burden of proof in establishing lack of knowledge of commencement of the investigation.

Ford claims that it made valid prior disclosures of "all of Ford's post-entry direct payments to foreign vendors," because "direct payments were not part of Operation Hat Trick."  It points out that the report of investigation ("ROI") commencing the operation stated that it was "a special operation targeted at undeclared assists and indirect payments"; that internal Customs correspondence announcing the start of the investigation described it as "targeted at undeclared assists and indirect payments"; that Customs' initial notice of investigation to Ford referred only to "assists and indirect payments"; that four of the five attendees at a meeting scheduled to clarify the meaning of "indirect payments" testified that the parties left the meeting without a clearer understanding of how the investigation used the term; and that the other witness's contrary testimony is contradicted by the ROI he wrote to memorialize the meeting.

The Court of International Trade, faced with these same arguments, concluded that "Ford knew or should have known that the term 'indirect payment,' as used by Customs in its notification to Ford of the investigation, included all payments that impacted the final price paid for the merchandise in question," whether direct or indirect. Negligence Decision, 395 F. Supp. 2d at 1216. In so concluding the court relied primarily on testimony about a meeting that occurred on June 7, 1991, between representatives of both Customs and Ford to clarify the scope of the term "indirect payments" as used in the investigation. Gibson, a Ford witness, testified that at the meeting, when asked to clarify their understanding of what "indirect payments" meant, Customs employees Turner and Neckel provided Ford with a summons regarding entries relating to the Mercury Capri and said "Here, this is what it means." Gibson also stated that the Capri summons asked for records relating to "all payments," and that this defined Customs' understanding of what "indirect payments" meant. Neckel testified that at the meeting Customs "advised Ford that [the investigation] included the entire full scope of their importations relative to certain vehicles and vehicle components."

Based on this evidence, one could reasonably conclude that, at the meeting, Ford's representatives asked Customs to define the scope of payments included in the category "indirect payments," and that Customs responded by indicating that the payments referred to in the Capri summons—which, it is undisputed, sought information with respect to "assists and payments," rather than to "indirect payments"—were the kinds of payments at issue in the investigation. One could also reasonably conclude that Ford's representative Gibson left the meeting with knowledge of Customs' interpretation. Thus, the trial court's conclusion that after that meeting Ford "knew or

should have known" that the investigation included all payments was not clearly erroneous.

The question, then, is whether the scope of an investigation which, by its terms, is limited to "assists and indirect payments," may be broadened by such informal communications to include direct payments. Ford argues that it may not, because under applicable regulations, "if Customs wished to expand the scope of its investigation beyond the topics identified in the May 23, 1991 letter to Ford, it had to do so expressly." It points to applicable regulations that, it claims, require that "in order to commence a formal investigation, the circumstances and facts about a possible violation had to be recorded in the investigatory record or the importer under investigation had to be informed about the specific type or circumstances of the suspected violation." The information provided to Ford, the company argues, "lacked the level of specificity required by the regulations to put Ford on notice that Customs' investigation also encompassed direct payments."

There is no question that, under the 1991 regulations, a formal investigation relating to "assists and indirect payments" was commenced no later than May 23, 1991. See 19 C.F.R. § 162.74(d) (1991). It also seems clear that, as of that date, Ford must be presumed to have knowledge of that investigation. 19 C.F.R. § 162.74(f) (1991). The question is thus whether the meeting of June 7, 1991, or other events served to expand the scope of the investigation to include direct payments under 19 C.F.R. § 162.74(e), which in 1991 provided that:

> A formal investigation is deemed to have commenced as to additional violations (outside the scope of the original investigation but committed by the same party) on the earliest of the following:

05-1584                                21

(1)     The date recorded in writing by the Office of Investigations in the investigatory record (including contemporaneous notes) as the date on which facts and circumstances were discovered or information was received which caused an investigating agent to believe that the possibility of a violation of 19 U.S.C. 1592 existed with respect to the additional violations;

(2)     The date on which an investigation agent, having property identified himself and the nature of his inquiry, had, either in person or in writing, made an inquiry of the person concerning the type of or circumstances of additional violations; or

(3)     The date on which an investigating agent, having properly identified himself and the nature of his inquiry, requested specific books and records of the person relating to the additional violations.

19 C.F.R. § 162.74(e) (1991).

The trial court performed no analysis under § 162.74(e) to determine whether an enlargement had taken place, concluding instead that Ford had notice of the full scope of the investigation when it received Customs' letter—referring only to "assists and indirect payments"—on May 23, 1991.  Negligence Decision, 395 F. Supp. 2d at 1216-17.  This was error.  The trial court's own analysis states that Ford did not understand, as of May 23, 1991, what "indirect payments" included, and came to that understanding only after the meeting of June 7, 1991.  Id. at 1216.  We agree with Ford that the evidence does not support a conclusion that, as of May 23, 1991, the investigation applied to direct payments.

As we have discussed, however, the evidence does support the conclusion that the June 7, 1991 meeting served to expand the scope of the investigation under § 162.74(e)(2) (1991), which states that the expanded investigation "commences" when an investigating agent makes an inquiry of the importer "concerning the type of or

circumstances of additional violations." The same meeting served to create a presumption of Ford's knowledge of the investigation under § 162.74(f)(2) and 19 U.S.C. § 1592(c)(4). Ford has presented no evidence sufficient to rebut that presumption. We conclude, therefore, that as of June 7, 1991, Customs' investigation had been broadened to include not only assists and indirect payments but also direct payments, and that Ford had knowledge of the broadened investigative scope. Any violations disclosed after that date cannot constitute prior disclosures under § 1592(c)(4). We therefore affirm the Court of International Trade's conclusion that none of the tenders cited by Ford constituted prior disclosures.

### IV. Scope of Investigation

The trial court found as fact that "[i]mportations related to the 1992 model year and thereafter were not within the scope of Customs' investigation." Negligence Decision, 395 F. Supp. 2d at 1196. It based that finding entirely on the testimony of Customs' own witness, Inspector Turner, who testified in his deposition that "[w]e told Ford we were looking five years backward," and that importations occurring in 1992 "would be outside the scope" of the investigation. Id. He further testified at trial that the investigation had to be "cut off" at some point because "the scope of the investigation would only extend that far—we knew we couldn't extend the investigation forever."[4]

Despite that finding, in calculating Ford's penalty, the trial court appears to have included tenders related to the 1992 and 1993 model years, including engines for the 1993 Taurus SHO (payment of $404,100); V-6 engines for the 1992 model year

---

[4] Turner's trial testimony suggested that the cut-off could have been in 1992 or 1993, but he retreated from that position when presented with his deposition testimony, which stated that the investigation did not include importations occurring in 1992 or later.

(payment of $695,874); and transmissions for the 1992 model year (payment of $458,893). See id. at 1201-03. These tenders were outside the scope of the investigation, Ford argues, and therefore should not have been included in the penalty.

Ford further alleges that the trial court included in its calculation of tenders for which "it was unclear to which model year the tenders related." Several tenders included within the calculations related to both in-scope model years and out-of-scope model years. See, e.g., id. at 1200 ¶ 54 (tender relating to "undeclared engineering and tooling cost prior to 1993 model"); id. at 1200 ¶ 61 (tender relating to lump-sum payments "for the 1991 and 1992 model year Festiva"); id. at 1203 ¶ 80 (tender relating to transmissions imported "for the 1989 through 1992 model year"); id. at 1201 ¶ 67 (tender relating to 1993 Taurus SHO engines); id. at 1197-98 (tenders relating to tooling assists and payments for model years 1987-1992). Ford asserts that "Customs' failure to prove the extent to which the duties at issue under these disclosures related to matters within the scope of Customs' investigation means that these tenders must be excluded from any penalty calculations."

The government contends that the trial court's finding 18—which states that entries relating to the 1992 model year were outside the scope of the investigation— was "taken out of context and pertained only to the scope of the investigation at its inception in mid-1991." It offers no support for this assertion, however, save citation to the very pages of the transcript relied upon by the trial court in rendering its fact-finding.

The government also asserts that various documents in the record "demonstrate[] the [Customs] agents' understanding that the scope of the investigation included model year 1992 vehicles and parts even if the entries relating to the

merchandise post-dated the June [7, 1991] meeting." We reject this attempt to overturn the trial court's fact-findings, which the government has not appealed. The trial court found, as fact, that importations related to the 1992 model year "were not within the scope of Customs' investigation." Negligence Decision, 395 F. Supp. 2d at 1196. That finding appears in a section of the opinion titled "Findings of Fact Relevant to the Commencement and Scope of Customs' Investigation." Id. at 1193. The statement's context and plain meaning are both unmistakeable: the scope of the investigation did not include entries relating to any model year after 1991. The Court of International Trade therefore erred when it included tenders relating to model years 1992 and later in its penalty calculations. The tenders relating to post-1991 model years in paragraphs 67, 75, and 79 of the trial court's opinion should have been excluded from those calculations.

With respect to tenders involving multiple model years, the question is more complicated. Ford asserts that Customs had the burden of proving the extent to which those disclosures related to matters within the scope of the investigation; the government argues that Ford's tenders failed to satisfy the specific requirements for prior disclosures set forth in 19 C.F.R. § 162.71(e) and § 162.74, and therefore cannot claim the prior disclosure safe harbor from violations of 19 U.S.C. § 1592.

We agree that whether Ford's tenders relating to multiple model years qualified as prior disclosures is irrelevant to whether the trial court properly included those tenders in its penalty calculations. To the extent that those tenders included amounts relating to model years outside the scope of the investigation, no "violation" was ever alleged or proved with respect to them, and they have no need of the prior disclosure

safe harbor. The appropriate remedy for this error is to remand the case to the Court of International Trade for additional fact-finding as to which portion of the multi-year tenders related to model years within the scope of the investigation.

V.      Dutiability of Shortfall Payments

In 1988, Ford entered into a contract with Mazda Motor Corporation for the purchase by Ford of Festiva cars for importation into the United States. Negligence Decision, 395 F. Supp. 2d at 1217. That contract provided that Ford was committed to purchasing 85,000 cars each year (the "Annual Volume Commitment"). The contract also included a section 2.3, "Volume Price Adjustment," which stated that so long as the Annual Volume Commitment remained unchanged, the purchase price for those cars would be determined by a formula based on the percentage of the commitment total for which Ford actually placed orders in a given year. The Volume Price Adjustment section provided for different pricing if Ford ordered (A) more than 50%, but less than 90%, of the annual commitment; (B) less than 50% of the annual commitment; and (C) more than 110% of the annual commitment. The contract also included an entirely separate section 3, "Prices," which set forth "[t]he initial purchase price for each model of Ford Vehicles" and a method for making annual adjustments to that price for new model years. It appears that the formulas for Volume Price Adjustments in section 2.3 represent a function, in part, of the initial prices set in section 3.3.

Ford reported several direct payments resulting from Festiva orders of less than 85,000 units for the 1990, 1991, and 1992 model years. Id. at 1200 ¶¶ 55, 61. The Court of International Trade concluded that "the lump sum payments made by Ford pursuant to the Festiva Agreement are dutiable," reasoning that the payments "did not

constitute a penalty," but "were related to the price actually paid or payable and, therefore, were dutiable." Id. at 1219. It relied, in particular, on its conclusion that "Ford's payments under the Festiva Agreement were not triggered by or based on a purchase commitment or quota. Rather, the purchase price or transaction value of each vehicle was adjusted depending on changing market conditions." Id. at 1218-19. Therefore, the trial court included tenders relating to the Festiva contract in its penalty calculations.

On appeal, Ford relies on the Court of International Trade's decision in Chrysler Corp. v. United States, 17 C.I.T. 1049, 1053-55 (1993), in which that court concluded that fees paid by the importer for its failure to purchase a minimum number of car engines were not dutiable, because "[a]n expense arising from the failure to purchase certain merchandise is not a component of the price paid for the acquisition of other products," but is "a form of liquidated damages." The same reasoning, Ford asserts, is applicable here: "Ford incurred expenses stemming from its failure to purchase enough Festivas to fulfill its volume commitments. Under Chrysler, these fees simply cannot be included as a component of the price paid for the Festivas that Ford did purchase."

The government counters, and the trial court ruled, that because the Volume Price Adjustment is structured to "penalize" Ford for purchasing less than its commitment not by imposing a direct penalty but by increasing the price of each car that Ford does purchase, the holding in Chrysler does not apply.

It is clear on the face of the contract that the price actually payable for Festiva vehicles is a function, in part, of the number of such vehicles purchased by Ford in a given model year. As the number of vehicles purchased rises, the price per vehicle

drops.  Payments made pursuant to the shortfall provision, therefore, are part of the true economic cost to Ford of purchasing the vehicles, and are thus part of the "total payment . . . made, or to be made, for imported merchandise" for purposes of § 1401a(b)(4)(A).  The payments made by Ford pursuant to the shortfall provision were dutiable under 19 U.S.C. § 1401a(b)(1) as part of the price "actually paid or payable" for the cars.

This conclusion is supported by our precedent, which has emphasized that the price "paid or payable" for imported merchandise includes all payments "made to the seller in exchange for merchandise sold for export to the United States," even where such payments "represent[ ] something other than the per se value of the goods." Generra Sportswear Co. v. United States, 905 F.2d 377, 380 (Fed. Cir. 1990).  The key inquiry in determining whether a particular payment should be included in transaction value is "the actual transaction between the buyer and the seller; if [the payments] were transferred by the buyer to the seller, they are part of transaction value."  Id.; see also Luigi Bormioli Corp., Inc. v. United States, 304 F.3d 1362, 1367 (Fed. Cir. 2002) (citing Generra Sportswear and noting that the "price actually paid or payable" should be construed broadly).  Our conclusion is also supported by section (b)(4)(B) of the statute, which provides that "[a]ny rebate of, or other decrease in, the price actually paid or payable that is made or otherwise effected between the buyer and seller after the date of the importation of the merchandise into the United States shall be disregard in determining the transaction value" of the merchandise.  19 U.S.C. § 1401a(b)(4)(B). The statute's exclusion from transaction value post-importation decreases in the price paid or payable suggests, by negative implication, that post-importation increases in the

price paid or payable are presumptively includible in transaction value.  Cf. Century Imps., Inc. v. United States, 205 F.3d 1308, 1311-12 (Fed. Cir. 2000) (excluding from transaction value post-importation reimbursements that decreased the actual price paid, pursuant to § 1401a(b)(4)(B)).

Here, the disputed payments reflect the true economic cost of the merchandise sold to Ford, and are therefore dutiable as part of the "actual transaction between the buyer and the seller." Generra Sportswear, 905 F.2d at 380.  The Court of International Trade properly included the unpaid duties on such payments in calculating the penalty.

## VI.    Amount of Penalty

The Court of International Trade imposed the maximum penalty permitted by the applicable statute—double the revenue lost to the government, for a total of $17,151,923.60.  Negligence Decision, 395 F. Supp. 2d at 1222; see 19 U.S.C. § 1592(c)(3).  On appeal, Ford claims that the trial court's action constituted "clear error," both because it was not consistent with the court's own findings of fact and because the trial court failed to properly consider mitigating factors.

Ford's allegation with regard to abuse of discretion is without merit.  A trial court has considerable discretion to award civil penalties within the statutory range.  See United States v. Valley Steel Prods. Co., 729 F. Supp. 1356, 1359 (Ct. Int'l Trade 1990). We may overturn the trial court's determination only if it represents an abuse of discretion, that is, if its decision was "clearly unreasonable, arbitrary, or fanciful," "based upon an erroneous construction of the law," based upon fact findings that are "clearly erroneous," or if the record contains no evidence upon which the trial court could have rationally based its decision.  Hughes Commc'ns Galaxy, Inc. v. United States, 271 F.3d

1060, 1065-66 (Fed. Cir. 2001). Ford has identified no basis for a conclusion that the trial court abused its discretion in awarding the maximum penalty.

With regard to mitigation, Ford asserts that the trial court failed to consider the fourteen factors to be weighed in determining whether mitigation is warranted under the Court of International Trade's decision in United States v. Complex Machine Works Co., 83 F. Supp. 2d 1307 (Ct. Int'l Trade 1999). It points in particular to three factors: Ford's "good faith efforts to comply with customs statutes and regulations," its history of previous violations, and the relatively small benefit derived by Ford from the violations relative to its total import volume.

Ford's argument is without merit. The Complex Machine Works decision lists fourteen non-exclusive factors that a trial court may consider relevant to mitigation. On appeal, Ford makes specific reference to only three such factors that, it argues, run in its favor. We cannot imagine a case in which the defendant could not find refuge in at least one potentially mitigating factor. Ford's position seems to be that if it can demonstrate the applicability of any potentially mitigating factor, the trial court is precluded from imposing a maximum penalty. We find no basis for that conclusion in Complex Machine Works, the applicable statute, or our own precedent. Cf. Law v. U.S. Postal Serv., 852 F.2d 1278, 1280 (Fed. Cir. 1988) (sustaining maximum penalty of removal from employment despite existence of mitigating factors). We therefore conclude that the trial court's decision to impose the maximum penalty was within its discretion.

We agree, however, that in adding up the lost revenues used to calculate that penalty the trial court made several significant errors. Based on the record before us, it

appears that the trial court incorrectly or inadvertently included in its damages calculations tenders that did not violate § 1592. Specifically, the lump-sum payment relating to the 1991 Capri reported on August 26, 1991, appears to have been disclosed to Customs within the period allowed by the Reconciliation Agreement, and therefore did not violate § 1485. Negligence Decision, 395 F. Supp. 2d at 1199 ¶ 50. The same appears to be true for the payment relating to the 1993 Taurus SHO reported on November 18, 1992. Id. at 1201 ¶ 70. The government does not dispute this. There appears to be no basis, therefore, for the inclusion of these tenders in the penalty determination.

In addition, as discussed in part IV above, the trial court appears to have included in its calculations tenders that occurred outside the scope of the investigation—specifically, tenders relating to model years 1992 and 1993. Those tenders should have been excluded from the penalty calculation.

Finally, the penalty must be recalculated to reflect the absence of § 1484 liability and any other adjustments required by parts I through VI of this opinion.

## CONCLUSION

The trial court's judgment is hereby affirmed in part, reversed in part, and remanded to the Court of International Trade for further consideration in light of this opinion.

AFFIRMED-IN-PART, REVERSED-IN-PART and REMANDED.

No costs.